In re Ernest L. MARRACCINI, Magisterial District Judge In and For Magisterial District 05–2–26, Allegheny County.

No. 2 JD 05.

Court of Judicial Discipline
of Pennsylvania.

July 20, 2006.
Order on Sanctions Oct. 2, 2006.

Before: SPRAGUE, P.J., HALESEY, CAPOFERRI, PANEPINTO, O'TOOLE, SANDLER and LAMB, JJ.

OPINION BY Judge SPRAGUE.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on February 16, 2005 against Magisterial District Judge Ernest L. Marraccini (Respondent) in which the Board charges Respondent with three violations of the Pennsylvania Constitution and three violations of the Rules Governing Standards of Conduct of Magisterial District Judges all of which are based on Respondent's conduct over a 20–30 minute period on the morning of May 25, 2004. The Board charges that Respondent's conduct was such that subjects him to discipline under the Pennsylvania Constitution, Article V, § 18(d)(1) for six separate reasons:

1. The Respondent has violated Article V, § 18(d)(1) of the Pennsylvania Constitution by committing misconduct in office. (Count 1).
2. The Respondent has violated Article V, § 18(d)(1) of the Pennsylvania Constitution by failing to perform the duties of office. (Count 2).
3. The Respondent has violated Article V, § 18(d)(1) of the Pennsylvania Constitution by engaging in conduct which brings the judicial office into disrepute. (Count 3).
4. The Respondent has violated Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges which provides in part:

> A magisterial district judge shall devote the time necessary for the prompt and proper disposition of the business of his office.[1] (Count 4).

5. The Respondent has violated Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges which provides in part:

> A magisterial district judge shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity. (Count 5).

6. The Respondent has violated Rule 4D. of the Rules Governing Standards of Conduct of Magisterial District Judges which provides in part:

> A magisterial district judge shall accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law. (Count 6).

The Board and the Respondent have submitted stipulations as to some of the facts pursuant to C.J.D.R.P. No. 502(D)(2). The Court accepted the pertinent stipulations and proceeded to trial on September 28, 2005. The Court now makes its Findings of Fact; those which have been stipulated are so designated.

## II. *FINDINGS OF FACT*

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania and Judicial Conduct Board Rule of Procedure 31(A)(3), promulgated by the Pennsylvania Supreme Court on March 20, 1995 (amended 1996), the Board is granted authority to determine whether

---

1. In the Complaint the Board inaccurately quotes the Rule as providing "... prompt and proper disposition of the business of court."

there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or justice of the peace, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline. (Stipulation No. 1).

2. Since on or about December 28, 1992, the Respondent has served continuously to the present as magisterial district judge for Magisterial District 05–2–26 in Allegheny County, the Fifth Judicial District, Pennsylvania, encompassing the Townships of Elizabeth and Forward, and the Boroughs of Elizabeth and West Elizabeth, and with an office at Swiss Alpine Village, 250 Swiss Lane, Route 48, Elizabeth, Pennsylvania, 15037. (Stipulation No. 2).

3. On or about May 25, 2004, the Respondent presided over court for Magisterial District Judge Susan F. Evashavik, Magisterial District 05–2–08 in Allegheny County, at 2065 Ardmore Boulevard, Pittsburgh, Pennsylvania, 15221. (Stipulation No. 3).

4. Judge Evashavik's magisterial district includes Edgewood Borough.

5. Respondent substituted ("covered") for Judge Evashavik that day at her request. She made the request by telephone about a week earlier at which time it was agreed that Respondent would arrive at 9:30 a.m. (N.T. 184–85). He had covered for her predecessor before but never for Judge Evashavik. (N.T. 186). Respondent had covered for other magisterial district judges 51 times in 2003 and 31 times in 2004. (N.T. 183).

6. Judge Evashavik's office had scheduled thirty-three traffic cases for 9 a.m. that morning. All thirty-three cases had been filed by the Edgewood Borough Police Department.

7. When Respondent arrived at Judge Evashavik's court shortly before 9:30 a.m. she was waiting at the rear entrance and they engaged in some conversation after which she told him that "the chief would be there as the reader because the officers weren't going to show." (N.T. 187, 219, 227).

8. On several occasions both before and after Respondent opened court, Chief Paul Wood of the Edgewood Borough Police Department told Respondent that under the rules he couldn't dismiss or "throw out" a case just because the officer doesn't show and that he would be reading the cases. (N.T. 42, 46, 49, 62–63, 66–67, 103, 187–89, 193). Respondent warned the Chief that he might just throw out all of the cases (N.T. 189) and told him that he knew the rules. (N.T. 193).

9. The rule to which Chief Wood was referring was Pennsylvania Rule of Criminal Procedure No. 454(B) which provides:

If the defendant pleads guilty, the issuing authority shall impose sentence. If the defendant pleads not guilty, the issuing authority shall try the case in the same manner as trials in criminal cases are conducted in the courts of common pleas when jury trial has been waived; however, in all summary cases arising under the Vehicle Code or local traffic ordinances, the law enforcement officer observing the defendant's alleged offense may, but shall not be required to, appear and testify against the defendant. In no event shall the failure of the law enforcement officer to appear, by itself, be a basis for dismissal of the charges against the defendant.

10. Respondent obtained the citations from Judge Evashavik's office staff and brought them to the bench. The citations were stapled together in batches of five. Since the cases were to be called in the order in which the defendants had signed

in, it was necessary for Respondent to unstaple the batches. Respondent was required to do this with his fingernails and in the course of this one of the batches fell to the floor. Officer Quinn retrieved it and put it back on the bench. (N.T. 191–92).

11. After disposing of a case filed by a state policeman (N.T. 194), Respondent called the first case of the thirty-three filed by officers of the Edgewood Borough Police Department. This case was a citation against Sterling Howard Murray charging that he had failed to stop at a stop sign; the citation had been issued by Officer Livingston of the Edgewood Borough Police Department. (N.T. 55, Board Exhibit A).

12. Respondent asked if the issuing officer was present and Chief Wood stated he was not but again told the Respondent that he was allowed to read the cases, that Judge Evashavik allowed "us" to read the cases (N.T. 62–63), that Judge Evashavik doesn't require the issuing officer to be present nor did the law require it. (N.T. 103).

13. Respondent found the defendant not guilty. (N.T. 45–47, 62, 103–04, 200). Before he left the courtroom the defendant asked Respondent if he would get his collateral back; Respondent replied that "if I don't spend it on my vacation, yes, you'll be getting your money back." (N.T. 45, 104, 200). This remark was made in a joking manner in an effort to lighten the atmosphere in the courtroom. (N.T. 200).

14. The second case of the Edgewood Borough cases called was a citation filed against Neil Salopek for driving with an expired license; the citation had been issued by Officer Lewis of the Edgewood Borough Police Department. (N.T. 46, 105, 115–16, 197, Board Exhibit A).

15. Officer Lewis was not present and the Commonwealth did not produce any evidence that the defendant's license was expired at the time of the citation and, upon the direction of Respondent, Officer Quinn, who was present in court with Chief Wood, examined the defendant's license and reported that it appeared to be valid, whereupon Respondent found the defendant not guilty. (N.T. 46, 105, 115–16, 196–98).

16. Chief Wood testified that Officer Quinn had the certified copy of the Penn-DOT record which might have established that, at the time the citation was issued, Salopek's driver's license was expired: "So, Officer Quinn did have that sheet." (N.T. 46). Officer Quinn testified that "he wouldn't have had that but Chief Wood would have." (N.T. 115). Quinn testified that neither he nor Wood offered it. (N.T. 107). The Respondent testified that neither Wood nor Quinn had it or offered it. (N.T. 197–99). We find that neither had it nor offered it into evidence.

17. The third case of the Edgewood Borough cases called was a citation filed against Rachel Elizabeth Barron for failure to obey a traffic control device (§ 3111A of the Vehicle Code—a no-points violation); the citation had been issued by Officer Kusinsky of the Edgewood Borough Police Department. (N.T. 47–48, 106–07, 195, Board Exhibit A).

18. Although Officer Kusinsky was not present (N.T. 47), the defendant testified after which Respondent found the defendant guilty of the no-points violation (§ 3111A). (N.T. 47–48, 106–07, 195).

19. After the defendant left the courtroom, Chief Wood again told Respondent that neither Judge Evashavik nor the law required the issuing officer to be present in traffic cases (N.T. 49, 107, 201–02) and demanded that Respondent allow him to read the tickets and not require the testimony of the issuing officer or any other witness. (N.T. 201). At this point Re-

spondent became very upset and told Chief Wood that he didn't need him to lecture him on the law and under the procedure the chief was demanding the Respondent stated "we'll just find everybody not guilty." (N.T. 50, 107).

20. Respondent left the courtroom and entered the secretaries' area, which was separated from the waiting room by a glass partition with a window, and announced to the remaining twenty-some defendants that all those with Edgewood Borough traffic tickets were not guilty and should leave (N.T. 24, 50, 108, 138, 147, 155, 203) because "there is no proof ... there's no evidence." (N.T. 155 (Shumaker)).

21. With that announcement, some confusion ensued amongst some of the defendants in the waiting room: some asked if they really were discharged; some asked if Respondent really was the judge; some asked if they would get their collateral back; some asked if they would get something in writing to prove they were not guilty. (N.T. 50, 108–09, 138, 147, 205).

22. Respondent answered the questions in a condescending, belittling and sarcastic manner. (N.T. 26, 51–52, 139, 147, 156, 232). He asked the defendants in the waiting room if they were all morons and didn't they understand the English language. (N.T. 51, 110–11, 129, 138, 147, 156).

23. All of the defendants eventually did leave after being assured that their collateral would be refunded by mail (N.T. 131, 134, 140, 158, 205–06) and after Respondent assured one defendant that he would send her a letter affirming that she had been in court and had been found not guilty. (N.T. 158–59, 207).

24. The only members of the Edgewood Police Department present in court that morning were Chief Wood and Officer Timothy Quinn. (N.T. 34, 92).

25. Of the thirty-three cases listed in Judge Evashavik's court for 9 a.m. that morning, the officers writing the citations were not present in twenty-nine. Officer Quinn was the issuing officer in four cases. (N.T. 93–94). Chief Wood had signed seven citations for alleged parking violations, all of which were alleged to have occurred between 3 a.m. and 5 a.m. on various dates, but Chief Wood had not observed or reported the violations and was not in a position to testify about them. (N.T. 73–74, 78, 80–81, 88–90).

26. In the thirteen years Respondent has served as a magisterial district judge, he acquired a reputation among the police, the District Attorney's Office and the defense bar for fully and industriously executing the duties of his judicial office, for doing so in a fair, impartial and professional manner; for conducting himself in an exemplary manner both on and off the bench, and for treating litigants and attorneys who appear before him in a patient, dignified and courteous fashion. (N.T. 164–178, 241–44).

## III. *DISCUSSION*

The amendment to the Constitution of Pennsylvania of 1993 established the Judicial Conduct Board and this Court, and provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the produc-

tion of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const., Article V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue .... It is not necessary that the evidence be uncontradicted ... provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986). *See, also, La Rocca's Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963), and *In re Cicchetti*, 697 A.2d 297, 306 (Pa.Ct.Jud.Disc.1997).

Acting under the provisions of C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case. The Panel, consisting of Conference Judge Sandler, Judge Halesey and Judge Panepinto, conducted the trial September 28, 2005. Findings of Fact were initially made by the Panel.

Since the Constitution requires that "all actions of the court ... shall require approval by a majority vote of the members of the court" the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. As we noted in *In re Nakoski*, 742 A.2d 260, 263 (Pa.Ct. Jud.Disc.1999) and *In re Manning*, 711

A.2d 1113, 1117 (Pa.Ct.Jud.Disc.1998), this Court is constrained to accord special deference to the findings of a Panel for, as the judges who hear the witnesses testify and observe their demeanor, it is they who are best positioned to assess credibility.

■ The Supreme Court of Pennsylvania has addressed this subject as follows:

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy (citations omitted).

*Commonwealth Dept. of Transportation v. O'Connell*, 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847, 858 (1984), "the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference,'" and in *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502, 516 (1984). "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others."

In this case, particularly respecting what took place in the courtroom, credibili-

ty of those who testified is pivotal, not only respecting what actually occurred, but also with respect to the overall environment in the courtroom, and the behavior of Chief Wood and Respondent, protagonists here. What took place outside the courtroom is largely undisputed.

We view this case as consisting of two separate (though related) episodes:

(1) Respondent's exercise of his judicial duties, i.e., his findings of not guilty in thirty-two of the thirty-three cases listed before him on the day in question,[2] and

(2) Respondent's conduct in dealing with the defendants in those cases in the waiting room outside the courtroom.

We will approach this case in that sequence and deal first with Respondent's disposition of the cases on the court's list that day.

■■■ The root of the controversy in this case is Pennsylvania Rule of Criminal Procedure 454(B) and the way it has been interpreted and implemented by Magisterial District Judge Evashavik and Chief Wood of the Edgewood Borough Police Department. The portion of Rule 454(B) pertinent here provides:

If the defendant pleads not guilty, the issuing authority shall try the case in the same manner as trials in criminal

cases are conducted in the courts of common pleas when jury trial has been waived; however, in all summary cases arising under the Vehicle Code or local traffic ordinances, the law enforcement officer observing the defendant's alleged offense may, but shall not be required to, appear and testify against the defendant. *In no event shall the failure of the law enforcement officer to appear, by itself, be a basis for dismissal of the charges against the defendant* (emphasis added).

According to the testimony of Chief Wood, Officer Quinn and Respondent, Judge Evashavik had interpreted this rule to permit—even require—a finding of guilty in the absence of any admissible evidence of guilt and, by way of implementing this interpretation, had established a protocol whereunder "the law enforcement officer observing the defendant's alleged offense," commonly did not attend the hearings and the testimony which he or she would [supposedly] give was given, as if by proxy, by the Chief who appeared as "reader."[3]

The Respondent, a judge of thirteen years experience, did not subscribe to the legitimacy of this interpretation of the rule, would not permit its implementation, and clashed with Chief Wood who repeatedly demanded that he do so.[4]

---

**2.** It is not clear whether any, some, or all of the charges filed by the Board are meant to apply to Respondent's findings of not guilty in the cases of John Sterling Murray and Neil Salopek, although it is certainly clear that Chief Wood and Officer Quinn were not happy about those findings.

**3.** At one point in his testimony the Respondent said: "... the chief one more time demands that he be allowed—demanded that I should say that he be allowed to read the ticket. And I frankly don't understand what the purpose of a reader is. But anyway ... what is the point of reading it because I can read it." (N.T. 201).

**4.** We would be remiss if we did not note here that we consider Judge Evashavik's instructions to Respondent as to how to conduct the trials (trials which he had sworn to conduct according to law—not according to her) as an explicit and improper attempt to influence the outcome of those cases. *See, In the Matter of Larsen,* 532 Pa. 326, 327, 616 A.2d 529, Appendix I at 384, 616 A.2d at 558 (1992). We, likewise, consider the repeated remonstrations of Chief Wood, to be improper. Chief Wood, as the representative of the Commonwealth, was a party to these proceedings, and his instructions to Respondent as to how to conduct the trials, as to what evidence to admit, were *ex parte* communications made

The dominant consideration here is that it was Respondent's prerogative and his responsibility—and his alone—to determine the admissibility of evidence in his courtroom and we find that his determination that Chief Wood's reading of the citations was not admissible was an entirely reasonable determination. We find that it was reasonable for Respondent to determine that Rule 454(B) of the Criminal Rules of Procedure did not require him to receive the testimony offered by a "reader."

We turn then to consider the charges filed by the Board in this case.

As stated earlier the Board has charged that Respondent's conduct on the morning of May 25, 2004 constituted:

1. misconduct in office (violation of Pa. Const., Article V, § 18(d)(1)) (Count 1),

2. failure to perform the duties of office (violation of Pa. Const., Article V, § 18(d)(1)) (Count 2),

3. conduct which brings the judicial office into disrepute (violation of Pa. Const., Article V, § 18(d)(1)) (Count 3),

4. failure to devote the time necessary for the prompt and proper disposition of the business of his office (violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges) (Count 4),

5. failure to be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity (violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges) (Count 5),

for the sole purpose of influencing the cases

6. failure to accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law (violation of Rule 4D. of the Rules Governing Standards of Conduct of Magisterial District Judges) (Count 6).

Counts 1, 2, 3, 4 and 6 relate to Respondent's disposition of the Edgewood Borough traffic cases listed before him on the morning of May 25, 2004. Count 5 relates to his conduct in dealing with the defendants in the waiting room outside the courtroom. Count 3 can reasonably be considered as relating to both; we will so consider it.

In light of our holding that Respondent's interpretation of Rule 454(B) as not requiring the admissibility of a "reader's" "readings" was reasonable, we find that his disposition of the Edgewood Borough cases did not constitute a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution for we find that such disposition:

1. was not misconduct in office,

2. did not constitute failure to perform the duties of office, and

3. was not such which brings the judicial office into disrepute.

We likewise find that Respondent's disposition of those cases did not constitute a violation of Rules 3A. or 4D. of the Rules Governing Standards of Conduct of Magisterial District Judges for we find that his dispositions:

4. did not constitute failure to devote the time necessary for the prompt and proper disposition of the business of his office, and

5. did not constitute failure to accord to every person who is legally interested in a proceeding, or his lawyer,

to the detriment of the other parties.

full right to be heard according to law.

■ On the other hand, we hold that *the manner* in which Respondent disposed of the cases outside the courtroom considered in combination with his undignified and discourteous treatment of the defendants in the waiting room constituted conduct which brings the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

We also hold that the Board has established that Respondent's conduct in dealing with the defendants in the waiting room was a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges which requires Respondent to be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity.

We first address the alleged constitutional violations of misconduct in office (Count 1), failure to perform the duties of office (Count 2), and conduct which brings the judicial office into disrepute (Count 3), (Pa. Const., Article V, § 18(d)(1)) and the alleged violation of Rule 3A., failure to devote the time necessary for the prompt and proper disposition of the business of his office (Count 4), and Rule 4D., failure to accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law (Count 6) all growing out of Respondent's findings of "not guilty" in the Edgewood Borough traffic cases.

All of these alleged violations are based upon the Board's assumption—upon the premise—that Pennsylvania Rule of Criminal Procedure No. 454(B) required Respondent to admit and consider as evidence of guilt whatever was written on the citations as read to the court by Chief Wood, the designated "reader" for the day. *Inasmuch as* Respondent refused to do

that and summarily found the defendants not guilty, the Judicial Conduct Board concludes that these dispositions were improper and that the asserted violations are established. Since we have held that Respondent made a reasonable determination that Rule 454(B) did not require the admission of Chief Wood's "readings" and that Respondent was justified in doing so in the exercise of his judicial duties, the Board was proceeding under a false premise and its conclusion that Respondent's findings of not guilty were improper is likewise false. Under Respondent's interpretation of the law, which we have found to be a reasonable interpretation, "not guilty" was the only possible disposition of these cases for there was no evidence of guilt. Under Respondent's interpretation of the law the only possible admissible evidence of guilt was the testimony of the issuing officers who "weren't going to show."

Therefore, Respondent's findings of "not guilty" in these cases was not "misconduct in office"; was not "fail[ure] to perform the duties of his office"; and it was not "conduct which brings the judicial office into disrepute."

Nor were Respondent's findings of "not guilty" in these cases a "failure to devote the time necessary for the prompt and proper disposition of the business of his office"—on the contrary Respondent's dispositions of these cases were prompt and in these circumstances were the *only* proper dispositions possible. Thus, no violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges has been established.

Nor did Respondent's disposition of these cases constitute a "failure to accord every person who is legally interested in a proceeding ... full right to be heard according to law." The Board maintains

that by refusing to permit Chief Wood to read the citations into evidence Respondent denied the Commonwealth the "full right to be heard according to law." We have held that, according to law, as interpreted by Respondent, the Commonwealth had no right to have Chief Wood read the citations into evidence, and, therefore, no violation of Rule 4D. of the Rules Governing Standards of Conduct of Magisterial District Judges has been established.[5]

An additional consideration which we believe to be important in assessing the applicability of Rule 4D. here, is the consideration of what the rule is designed to accomplish. We believe the rule was designed to protect litigants, and not to prescribe procedural rules of one kind or another. If the right of litigants "to a full hearing according to law" has not been violated, the rule has not been violated. The bottom line here is that the rights of the litigants in this case to a full hearing were not violated by Respondent's disposition of these cases: not the right of the Commonwealth because, under Respondent's reasonable interpretation of the law, it had no evidence to present—in fact *announced* it had no evidence to present; and not the defendants' rights—from beginning to end Respondent was acting to protect their rights.

We are cognizant that the Board introduced evidence at the trial that Chief Wood who was present in court, was the issuing officer, i.e., he had signed the affidavit on the citation, in seven of the cases listed before Respondent and that Officer Quinn, who was also present in court, was the issuing officer on four of the cases.[6]

However, all of Chief Wood's cases were citations for parking violations all alleged to have been earned between 3 a.m. and 5 a.m. on various dates; but Chief Wood had not observed or reported the violations but merely signed the citations which were issued when the "No Parking" tickets were not paid within the prescribed time (see Finding of Fact No. 24). Consequently, Chief Wood was not in a position to testify about the parking violations—unless he was allowed to "read" the citations, which we have held it was reasonable for Respondent to forbid.

With respect to Officer Quinn's cases, while it is true that he would have been in a position to testify regarding the citations he had issued, Respondent did not know that Quinn was the issuing officer on any of the cases, and, having been told by Judge Evashavik that none of the officers were going to show (see Finding of Fact No. 7), was justified in acting on that instruction.

The Board has made part of this record a computer print-out of the day's docket and it is by examination of that print-out that it is discovered that Quinn was the charging officer in four cases. However, Respondent did not have that print-out, and would have had no reason or occasion to consult it if he had, thus the only information that could have been in his mind on

---

**5.** We are aware that the Board presented the testimony of Michele Prior, one of the thirty-two defendants who were found not guilty, that she was disappointed, even annoyed, that she didn't have the opportunity "to say what I thought happened when I coasted through a stop sign. I expected to plead my case about a stop sign." (N.T. 30). Presumably, the Board offered this testimony to show that, by finding the witness "not guilty," Respondent denied her "full right to be heard according to law"—a violation of Rule 4D. We do not know of any law which requires a judge to take testimony from a defendant in a criminal case who, for lack of any evidence, has been found not guilty.

**6.** These four cases involved three defendants—one of the defendants was the recipient of two of Quinn's citations.

the question of which charging officers would be in court was what Judge Evashavik had told him, i.e., "None"; and this is exactly what happened in the three cases he did call, thereby further justifying his reliance on what Judge Evashavik had told him. It is upon that which he knew that he should be judged.

Careful consideration of the testimony of all three individuals who were present in Judge Evashavik's courtroom that morning—Chief Wood, Officer Quinn and Respondent—shows that all are in agreement that Chief Wood repeatedly and insistently told Respondent that the law required that Respondent allow him to "read" the citations, that Respondent resented this and let it be known that he resented the Chief of Police instructing him on the law, and that serious tension developed in the courtroom between Respondent and Chief Wood—the Respondent striving to resist doing something he justifiably regarded as improper and the Chief persisting in telling him that he was required to do it. In these circumstances we are not disposed to second-guess Respondent's handling of the situation and we believe he acted reasonably in accepting Judge Evashavik's briefing; given to him before he opened court that morning, that "the officers weren't going to show." Consequently, we hold that Respondent's disposition of all of the Edgewood Borough cases was proper.

As stated earlier, however, we find that Respondent's conduct after he left the courtroom, which included his announcement to the defendants in the waiting room that they were all "not guilty," in combination with his discourteous treatment of those defendants constituted conduct which brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

In *In re Smith*, 687 A.2d 1229 (Pa.Ct. Jud.Disc.1996), this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute. In *In re Cicchetti*, 697 A.2d 297, 310 (Pa.Ct.Jud.Disc. 1997), this Court reiterated that notion as it concluded that a judge's conduct in persisting in making sexual advances towards a subordinate employee who repeatedly rejected the advances constituted conduct of such an extreme nature that the judicial officer had brought the judicial office itself into disrepute.

In *Cicchetti*, 697 A.2d at 312, this Court noted that:

> The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

In *Smith*, we said that:

> "Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra*, at 1239.

In this case, although the findings of not guilty in the twenty-some cases which were not called may have been justified, the method by which Respondent announced that finding was not, and, when considered together with his behavior in the waiting room, i.e., his interaction with the defendants there, was beyond what the public may reasonably expect from a judge.

The reaction to Respondent's announcement in the waiting room to the defen-

dants assembled there was variously described as follows:

A.  They were all yelling through the window wanting to know if the judge was a real judge. They wanted to know if it was a joke. They wanted to know if they were really dismissed. (Dodge N.T. 127).

A.  I remember the judge going to the window and asking everyone in the courtroom who was there for traffic hearings and pretty much everyone in the waiting room raised their hands.

Q.  And how many people were in that waiting room?

A.  I would say maybe 20, 25, I would say around there. And then everyone raised their hands and the judge had told them that it was all dismissed, they can leave.

Q.  And how did he do that, if you could describe the way he did it?

A.  He was waving his hands and he told everyone to go, that they were done, they could leave, it was dismissed.

Q.  And what happened after he said this?

A.  After he said it, a lot of people came to the window and wanted to find out when they were getting their money back, if he was really a judge, so a lot of Pandemonium broke out in the courtroom that day.

Q.  And what was Judge Marraccini doing?

A.  He was at the window and he was telling them that at one point he had called them a bunch of morons, that they should just leave now before he finds them all guilty. (Granny N.T. 138).

A.  Afterwards, afterwards after the judge had left the phones would not stop ringing. There were a lot of agitated people that were questioning if they were getting their collateral money back, asking if he was really the judge. They didn't believe that he was the judge. So, that went on probably for the next couple of days. (Granny N.T. 140–41).

A.  I just remember being in my desk and then just a bunch of commotion starting. Everybody like basically at the window because the judge had come out and said that the cases were dismissed, anybody that was there can go.

And then people weren't sure if he was a judge or not. They didn't know who he was. And, you know, people were asking what about their money, are they going to get their money back. And like sarcastically he said, no, I'm going to spend it on vacations. But I mean they didn't know that he was joking. And them people didn't understand so he said, what are you, a bunch morons, you know, this isn't a circus. (McAllen N.T. 147).

Q.  And while you were in the waiting room, do you remember something unusual happening? Did the judge finally appear?

A.  Yes.

Q.  Could you tell the Court about that?

A.  He came out and he just said everyone with a traffic ticket get out of my courtroom. There's no proof or he said there's no evidence, something to that. I don't remember his exact words, but he wanted everyone to get out.

Q.  And what was his manner when he came out and made this announcement? To the best of you recollection, what did he do? Did he just -

A.  He was yelling. He was yelling at us to get out of his courtroom. He just wanted us out of there. He just

wanted us to leave. (Shumaker N.T. 155–56).

Q. What was your personal perception of this experience in that court that day?

A. Just really surprised of what happened. Just couldn't believe how things went. It wasn't what I was expecting at all. I didn't know, I didn't know if I could really prove that that ticket didn't belong to me. It's hard to prove you don't own something, but I think that there was some sort of mistake. But that's the last thing I kind of expected to happen was what happened.

Q. And what was your perception of this judge's behavior?

A. Well, he just acted crazy.

Q. Was it a pleasant experience for you to be at court that day?

A. No.

Q. Is that what you expected the judge to behave like in front of people?

A. No, no, I did not expect anybody to behave like that. (Shumaker N.T. 159–60).

We believe that the expectations of these members of the public were reasonable and find that Respondent's announcement of his "not guilty" findings to the defendants en masse and his concomitant discourteous treatment of them to be so extreme as to bring the judicial office into disrepute.

■ We consider now Count 5 which charges Respondent with violating Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges which provides that:

A magisterial district judge shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity, and shall require similar conduct of lawyers, of his staff and others subject to his direction and control.

In addition to Chief Wood and Officer Quinn, several of Judge Evashavik's court employees as well as two defendants who were in the waiting room testified that when some of the defendants questioned Respondent about the not guilty findings he became upset and impatient asking them if they were "morons" and "didn't they understand English." (N.T. 51 (Wood), 110 (Quinn), 129 (Dodge), 138 (Granny), 147 (McAllen), 156 (Shumaker)). These witnesses described Respondent's behavior as belittling, sarcastic and demeaning. We were particularly struck by the testimony of Tanya Shumaker who had come to court that morning in response to a parking ticket and who wasn't sure Respondent had meant to include her when he announced that those with "traffic" tickets should go home. She testified "he answered me, anybody—he moved his head from his ear to his shoulder—anybody with any kind of traffic ticket get out of my courtroom now. (Indicating) . . . back and forth kind of making fun of me (Indicating) . . . everybody was standing there looking at me, I felt really stupid." (N.T. 156). Respondent essentially did not dispute this testimony. (N.T. 229–34).

We find that this testimony describes Respondent as neither patient, dignified nor courteous to these litigants and that the Board has established by clear and convincing evidence that this conduct of Respondent constituted a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

## IV.  CONCLUSIONS OF LAW

■ A.  The conduct of Respondent in disposing of the Edgewood Borough traffic cases:

1. does not constitute misconduct in office.

2. was not such that constitutes a failure to perform the duties of office.

3. was not such that brings the judicial office into disrepute.

4. was not such that constitutes failure to devote the time necessary for the prompt and proper disposition of the business of his office.

5. was not such that constitutes a failure to accord to every person who is legally interested in a proceeding, or their lawyer, full right to be heard according to law.

B. The conduct of Respondent in dealing with the litigants in the waiting room was such that constitutes a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

C. The conduct of Respondent in the waiting room which included the manner of his announcement of the "not guilty" findings to the defendants en masse and his impatient, undignified and discourteous treatment of those defendants was such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

D. Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

### ORDER

PER CURIAM.

AND NOW, this 20th day of July, 2006, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served on the Judicial Conduct Board and upon the Respondent,

That, either party may file written objections to the Court's Findings of Fact and Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefor and shall be served on the opposing party,

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument,

That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

SANDLER, J., files a concurring opinion.

PANEPINTO, J., files a concurring and dissenting opinion.

MUSMANNO, J., did not participate in the consideration or disposition of this case.

### CONCURRING OPINION BY Judge SANDLER.

I concur with the holding of the majority that Respondent did not violate the Pennsylvania Constitution nor any of the Rules promulgated by our Supreme Court Governing the Standards of Conduct of Magisterial District Judges when he refused to permit the violation of the Sixth Amendment of the United States Constitution and of Article 1, § 9 of the Pennsylvania Constitution, and refused to permit the introduction of hearsay testimony to convict

citizens of this Commonwealth in his court-room.[1]

As the majority has pointed out:

The root of the controversy in this case is Pennsylvania Rule of Criminal Procedure 454(B) and the way it has been interpreted and implemented by Magisterial District Judge Evashavik and Chief Wood of the Edgewood Borough Police Department. The portion of Rule 454(B) pertinent here provides:

If the defendant pleads not guilty, the issuing authority shall try the case in the same manner as trials in criminal cases are conducted in the courts of common pleas when jury trial has been waived; however, in all summary cases arising under the Vehicle Code or local traffic ordinances, the law enforcement officer observing the defendant's alleged offense may, but shall not be required to, appear and testify against the defendant. In no event shall the failure of the law enforcement officer to appear, by itself, be a basis for dismissal of the charges against the defendant.

According to the testimony of Chief Wood, Officer Quinn and Respondent, Judge Evashavik had interpreted this rule to permit—even require—a finding of guilty in the absence of any evidence of guilt and, by way of implementing this interpretation, had established a protocol whereunder "the law enforcement officer observing the defendant's alleged offense," commonly did not attend the hearings and the testimony which he or she would [supposedly] give

was given, as if by proxy, by the Chief who appeared as "reader."

The Respondent, a judge of thirteen years experience, did not subscribe to the legitimacy of this interpretation of the rule, would not permit its implementation, and clashed with Chief Wood who repeatedly demanded that he do so.[2]

The majority holds that it was "reasonable" for Respondent to rule that Rule 454(B) of the Criminal Rules of Procedure did not require him to admit testimony offered by a "reader."[3] I certainly agree with that holding. However, the majority opinion does not say it would have been "wrong" or "unreasonable" for Respondent to have ruled the other way and admitted the testimony of a "reader." The inescapable implication of that omission is that it would have been just as "reasonable" for Respondent to have ruled the other way and admitted the testimony of a "reader."

I proceed to this opinion because I believe it would have been unquestionably wrong for Respondent to have admitted the testimony of Chief Wood as "reader."

Review of the constitutional authorities demonstrates that Respondent was right to exclude Chief Wood's "testimony," and that the procedure established by Judge Evashavik and urged on Respondent by Chief Wood is unconstitutional and offends basic rules of evidence. To follow that procedure would have been *unlawful*—and far from "reasonable."

Heed must be taken of the Sixth Amendment to the United States Constitution and to Article 1, § 9 of the Pennsylvania Constitution both of which provide that

---

1. I also concur with the holding of the majority that Respondent's actions in the waiting area outside the courtroom where he announced the dismissal of all the cases and responded rudely to questions from the defen-

dants were such that subject him to discipline.

2. Majority Opinion p. 384.

3. *Id.* at 385.

a defendant in a criminal case has the right "to be confronted with the witnesses against him." In *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255, 258 (1968), the United States Supreme Court said:

> Many years ago this Court stated that "the primary object of the [Confrontation Clause of the Sixth Amendment] ... was to prevent depositions or *ex parte* affidavits[4] ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). More recently, in holding the Sixth Amendment right of confrontation applicable to the States through the Fourteenth Amendment, this Court said, "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). *See also Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

Under the procedure established by Judge Evashavik and pressed on Respondent by Chief Wood it was a given that defendants would not be confronted by the witnesses against them, i.e., by the law enforcement officers observing the defendants' alleged offense—a patent violation of the above stated constitutional principles.

In addition, the proposed "testimony" of Chief Wood, i.e., his "reading" of what the absent law enforcement officer had written on the citations, was hearsay and inadmissible under Pennsylvania Rules of Evidence 801 and 802:

> Those rules provide:
>
> Rule 801.   Definitions
>
> > The following definitions apply under this article:
> >
> > (a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
> >
> > (b) Declarant. A "declarant" is a person who makes a statement.
> >
> > (c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
>
> Rule 802.   Hearsay Rule
>
> > Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute.

In the proceedings taking place before Respondent on the day in question, Chief Wood was attempting to place in evidence written assertions by absent declarants to prove the truth of the matters asserted—which in every case perfectly fit the defini-

---

**4.** Such as the affidavits of the officers who issued the citations which Chief Wood was proposing to read into evidence.

tion of hearsay. Rule 802 provides that such testimony is not admissible.

It is commonly noted that the hearsay rule is as well known for its exceptions as for the rule itself. Rule 802 provides for three categories of exceptions:

(1) "except as provided by these rules,"

(2) "[except as provided] by other rules prescribed by the Supreme Court," and

(3) "[except as provided] by statute."

The only exception here applicable is the second, because the testimony of Chief Wood proffered here is not the subject of any exception contained in the Rules of Evidence, nor is it the subject of any statutory exception. It might, however, be asserted to be an exception by virtue of Rule of Criminal Procedure 454(B), which is a rule "prescribed by the Pennsylvania Supreme Court." It is apparent that Rule 454(B) does not, and was not intended to, create an exception to the hearsay rule. Review of the language of Rule 454(B) itself reveals that no exception is intended or provided and this conclusion is confirmed when the language of that rule is compared with other Supreme Court rules and with statutes which clearly do provide exceptions to the hearsay rule.

Rule 454(B) does not even purport to establish an exception to the hearsay rule: it nowhere provides for the admissibility of testimony which would meet the definition of "hearsay." Indeed, it does not even address or approach the hearsay rule. What it says is:

— the officer who witnessed the alleged offense and wrote the citation may but shall not be required to, appear and testify, and

— the failure of that officer to appear and testify shall not, by itself, be a basis for dismissal of the charges.

It is to state the obvious to say that Rule 454(B) does not provide that somebody else may provide the testimony which the officer issuing the citation [supposedly/presumably/probably/most likely] would have given. The rule nowhere provides for the admissibility of *any* testimony, let alone hearsay.

In contrast, other rules prescribed by the Supreme Court which do provide for the admissibility of hearsay do so specifically. See, e.g., Pa.R.C.P. No. 4017.1—relating to videotape depositions, which specifically provides that they are admissible:

(g) In addition to the uses permitted by Rule 4020 a videotape deposition of a medical witness or any witness called as an expert, other than a party, *may be used at trial* for any purpose whether or not the witness is available to testify (emphasis added).

Pa.R.C.P. No. 4017.1(g). See, also, Pa. R.C.P. No. 4020 which specifies the various circumstances when depositions "may be used" at a trial.

Likewise, exceptions to the hearsay rule provided by statute, specifically provide that particular types of hearsay are admissible. For example:

— 42 Pa.C.S.A. § 6104 provides:

A copy of a record of governmental action or inaction ... *shall be admissible as evidence* that the governmental action or inaction disclosed therein was in fact taken or omitted.

— 35 Pa.C.S.A. § 450.810 provides:

Any record or duly certified copy of a record ... [which qualifies as a vital statistic] shall *constitute prima facie evidence* ....

— 13 Pa.C.S.A. § 1202 provides:

A document in due form purporting to be a bill of lading, policy or certificate of

insurance, official weigher's or inspector's certificate, consular invoice, or any other document authorized or required by the contract to be issued by a third party *shall be prima facie evidence* of its own authenticity and genuineness and of the facts stated in the document by the third party.

– 42 Pa.C.S.A. § 5936 provides:

A deposition taken under subsection (a) *shall be admissible* in a civil matter.

– 42 Pa.C.S.A. § 5919 provides:

The testimony of witnesses taken in accordance with section 5325 (relating to when and how a deposition may be taken outside this Commonwealth) *may be read in evidence* . . . .

– 42 Pa.C.S.A. § 5985.1 provides:

An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing physical abuse, indecent contact or any of the offenses enumerated in 18 Pa.C.S. Ch. 31 (relating to sexual offenses) performed with or on the child by another, not otherwise admissible by statute or rule of evidence, *is admissible in evidence* in any criminal proceeding . . . .

– 42 Pa.C.S.A. § 5986 provides:

A statement made by a child describing acts and attempted acts of indecent contact, sexual intercourse or deviate sexual intercourse performed with or on the child by another, not otherwise admissible by statute or court ruling, *is admissible in evidence* in a dependency proceeding . . . .

– 75 Pa.C.S.A. § 3368(d) provides:

A certificate from the station showing that the calibration and test [of a mechanical, electrical and electronic device used to measure speed of a motor vehicle] were made within the required period, and that the device was accurate, *shall be competent and prima facie evidence* of those facts in every proceeding in which a violation of this title is charged.

(Emphasis in all cases added.)

It is obvious, then, that Rule 454(B) neither does, nor intends to, create such an exception to the hearsay rule as to require the admissibility of the "readings" of Chief Wood—or any other "reader"—of the out-of-court statements of absent declarants. The common sense—and only constitutional—meaning of Rule 454(B) is that if the issuing officer, i.e., "the law enforcement officer who witnessed the alleged offense" does not appear, that, "by itself" shall not be a basis for dismissal of the charges, *where there is other evidence to establish the alleged offense.* Such other evidence could include, for example, another witness, film properly authenticated, or a statement by the defendant. This is a reasonable interpretation of the rule, and the only one which would permit its implementation without colliding with basic constitutional principles.

I point out, in addition, that even if Rule 454(B) were to be construed as creating an exception to the hearsay rule, i.e., as permitting the admission of the readings of Chief Wood or some other reader, then implementation of the exception would still have to pass constitutional examination. I believe that implementation which would permit conviction without the opportunity for defendants to confront and cross-examine the witnesses against them would violate the constitutional rights of defendants. The Supreme Court of the United States has so held.

In *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489, 495–96 (1970) that Court stated:

While it may readily be conceded that hearsay rules and the Confrontation Clause [of the Sixth Amendment] are

generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception.

> Given the similarity of the values protected, however, the modification of a State's hearsay rules to create new exceptions for the admission of evidence against a defendant, will often raise questions of compatibility with the defendant's constitutional right to confrontation.

In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), an out-of-court statement of defendant's wife was admitted at defendant's trial for assault and attempted murder because, since the wife had admitted that she had led defendant to the victim's apartment and thus had facilitated the crime, her statement was against penal interest and admissible under that exception to the hearsay rule in the State of Washington, Washington Rule of Evidence 804(b)(3) (2003). The Supreme Court of the United States overruled the Supreme Court of Washington, as well as its own earlier ruling in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and held that the Confrontation Clause prohibits the introduction of "testimonial" hearsay from an unavailable witness against a defendant in a criminal case regardless of whether the out-of-court statement would qualify for admission under some exception from the hearsay rule and regardless of whether some judge considers the out-of-court statement to bear adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608 (1980). The latter concept had been adopted by the Court in the *Roberts* case which it overruled in *Crawford.*

It is clear that the Confrontation Clause applies to the testimony which Chief Wood sought to introduce in the Edgewood Borough cases. As Justice Scalia, writing for the Court in *Crawford* explained:

> [T]he Confrontation Clause applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

> Various formulations of this core class of "testimonial" statements exist: [1] "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . [2] "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," (citation omitted) [3] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . .

*Id.* at 51–52, 124 S.Ct. at 1364, 158 L.Ed.2d at 192–93 (2004).

The Court thus enumerated "three formulations" of what it considered to be the "core class" of testimonial hearsay. The Court observed that "[t]hese formulations all share a common nucleus" and that "some statements qualify under any definition." *Id.* The affidavits on the citations written by the absent police officers offered in this case qualify under all three formulations and the hearsay proffered here is prototypical "testimonial" hearsay.[5]

Underscoring its determination to permit no judicial nibbling at the core elements of the Confrontation Clause, the *Crawford* Court observed:

> The historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.

*Id.* at 53–54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194 (2004). And, again:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowl-edges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge [as had been approved in *Roberts*] is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses ... is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

> The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one.

*Id.* at 61–62, 124 S.Ct. at 1370, 158 L.Ed.2d at 199 (2004).

Reversing the judgment of the Supreme Court of Washington, the Court concluded:

> In this case, the State admitted Sylvia's [the wife's] testimonial statement against petitioner, despite the fact that

---

**5.** I think Justice Scalia aptly focuses upon the heart of the matter and upon the issue here prominent when he notes that "involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances." *Crawford v. Washington* at 56, 124 S.Ct. at 1367, 158 L.Ed.2d at 196, n. 7 (2004).

he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment. *Roberts* notwithstanding, we decline to mine the record in search of indicia of reliability. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation. *Id.* at 68–69, 124 S.Ct. at 1374, 158 L.Ed.2d at 203 (2004).

Thus, as stated earlier, even if Rule 454(B) were to be construed as creating an exception to the hearsay rule in Pennsylvania, and, even if the testimony proffered by Chief Wood would qualify as admissible under the rule, to admit it would be to deprive defendants of their Sixth Amendment right to confrontation as explicitly explained and laid down in *Crawford.*[6]

I mention two additional points.

First, the only exceptions to the hearsay rule which have been held, pre-*Crawford*, not to conflict with the Confrontation Clause, were those which were considered to fall within a "firmly rooted" hearsay exception. *See, Ohio v. Roberts, supra,* at 66, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607–08 (1980); *Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409, 411 (1895) (dying declarations); *Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069–70, 13 L.Ed.2d 923, 928 (1965) (dying declarations); *Mancusi v. Stubbs,* 408 U.S. 204, 213–14, 92 S.Ct. 2308, 2313–14, 33 L.Ed.2d 293, 301–02 (1972) (cross-examined prior testimony). By no stretch can a "Rule 454(B) exception" be considered to be "firmly rooted." For an exception to be a "firmly rooted exception" it must first be an "exception": it has never been held that Rule 454(B) created an exception to the hearsay rule. Nor, as pointed out above, does it, Majority Opinion pp. 385–87.

Second, it is important to remember that, in order for an out-of-court statement to be admitted without offending a defendant's rights under the Sixth Amendment, two elements must be present: (1) the absent witness must be unavailable and (2) the defendant must have had a prior opportunity for cross-examination, *Crawford, supra,* at 53–54, 124 S.Ct. at 1365–66, 158 L.Ed.2d at 194 (2004). In the Edgewood Borough cases before Respondent on the day in question both elements were absent. The absence of any opportunity for the defendants to cross-examine the issuing officers is obvious; but it must not be overlooked that the issuing officers also were not unavailable—they were "unavailable" only because they chose to be. In order to comply with the Sixth Amendment, the government must affirmatively establish that the witness is unavailable. *See, Crawford, supra,* at 57, 124 S.Ct. at 1367–68, 158 L.Ed.2d at 196 (2004), where the Court made the point that it had excluded testimony for violation of the Confrontation Clause "even where the defendant had ... an opportunity [to cross-examine] ... where the government had not established unavailability of the witness," citing *Barber v. Page,* 390 U.S. 719, 722–25, 88 S.Ct. 1318, 1320–22, 20 L.Ed.2d 255, 258–60 (1968).

**6.** In the following cases the Supreme Court granted certiorari, vacated judgment and remanded for proceedings in accordance with *Crawford: Wedgeworth v. Kansas,* 543 U.S. 801, 125 S.Ct. 214, 160 L.Ed.2d 1 (2004); *Calcano v. United States,* 543 U.S. 801, 125 S.Ct. 135, 160 L.Ed.2d 2 (2004); *LaFontaine v. United States,* 543 U.S. 801, 125 S.Ct. 46, 160 L.Ed.2d 1 (2004); *Varacalli v. United States,* 543 U.S. 801, 125 S.Ct. 36, 160 L.Ed.2d 1 (2004); *Shields v. California,* 541 U.S. 930, 124 S.Ct. 1653, 158 L.Ed.2d 352 (2004); and *Corona v. Florida,* 541 U.S. 930, 124 S.Ct. 1658, 158 L.Ed.2d 352 (2004).

It is worthwhile to examine the facts in the *Barber* case.

There the State of Oklahoma argued that it was not error for the lower court to have permitted the introduction of the transcript of a witness's testimony at the preliminary hearing because the witness was outside the jurisdiction and therefore "unavailable" at the time of trial and that the defendant had had the opportunity to cross-examine the witness at the preliminary hearing. The United States Supreme Court reversed the Court of Appeals, holding that it had not been established that the witness was "unavailable," and, consequently, the demands of the Confrontation Clause had not been satisfied even though there had been an opportunity to cross-examine at the preliminary hearing.[7]

In the course of its opinion, the Supreme Court said:

> We start with the fact that the State made absolutely no effort to obtain the presence of Woods at trial other than to ascertain that he was in a federal prison outside Oklahoma.

*Id.* at 723, 88 S.Ct. at 1321, 20 L.Ed.2d at 259 (1968). The Court then pointed out the several processes available to the State of Oklahoma to obtain the presence of a witness in federal custody and observed:

> In short, a witness is not "unavailable" for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why Woods was not

present to testify in person was because the State did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly.

*Id.* at 724–25, 88 S.Ct. at 1322, 20 L.Ed.2d at 260 (1968). Then, underscoring the importance of "unavailability," the Supreme Court held:

> Moreover, we would reach the same result on the facts of this case had petitioner's counsel actually cross-examined Woods at the preliminary hearing. See *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900). The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial. While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case.

*Id.* at 725–26, 88 S.Ct. at 1322, 20 L.Ed.2d at 260 (1968).

In the Edgewood Borough cases at issue here the "prosecutorial authorities have made [no] good-faith effort to obtain ... [the] presence [of the issuing officers] at trial"—on the contrary, the prosecutorial

---

7. The defendant's attorney declined to cross-examine the witness at the preliminary hearing and the State argued that this constituted a waiver of his right to confront the witness at trial. The Supreme Court held no waiver took place because, not only was the defendant unaware that the witness would be in a federal prison at the time of his trial and not only was he unaware that the State would make no effort to produce him, but the nature and function of a preliminary hearing may well have played a determinative role in the decision to cross-examine or not.

authorities deliberately and overtly planned their absence. So, in these cases, since the witnesses were not unavailable and there was no opportunity for prior cross-examination, the defendants' right to confront them could not be dispensed with.

Finally, I think that any discussion of this subject would be incomplete without consideration of the idea that the defendants' right to a trial *de novo* on appeal from a summary conviction of a violation of the Motor Vehicle Code in Judge Evashavik's court "cures" the violation of the Confrontation Clauses of the United States and Pennsylvania Constitutions. The short—and easy—answer is: it does not.

In *Commonwealth v. Cronin*, 336 Pa. 469, 9 A.2d 408 (1939), the Supreme Court of Pennsylvania held that a hearing *de novo* in the court of common pleas on appeal from an order of the Secretary of Revenue suspending his driver's license "protected" defendant against an arbitrary exercise of power by the Secretary. That Court held:

> Regardless of whether he was accorded a proper hearing before the Secretary, it is certain that the hearing *de novo* remedied the infringement of any constitutional right of which defendant may have been deprived. Therefore it is immaterial that he was not afforded an opportunity to confront his accuser and to cross-examine him. This right is one guaranteed under the Constitution to a defendant *in a criminal proceeding; Gaines v. Washington*, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793; *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674; *Howser v. Com.*, 51 Pa. 332, and it is not necessary for the purposes of this case to decide whether such guar-

antee extends to a party *in an administrative proceeding*.

*Id.* at 474, 9 A.2d at 411 (emphasis added).

It would be sufficient to conclude this discussion with the observation that in *Cronin* the Court was dealing with an administrative hearing—not a criminal case, as we are—and that the Court explicitly called attention to that critical difference and unconditionally recognized that the right of confrontation is "guaranteed ... in a criminal proceeding." It is helpful, nevertheless, to refer to a more recent case where the availability of a *de novo* hearing was held *insufficient* to save even a constitutionally deficient *administrative* hearing.

In *Kilfoyle v. Heyison*, 417 F.Supp. 239 (W.D.Pa.1976) a statutory three-judge court held that the availability of a *de novo* hearing on appeal did not "save" a Pennsylvania statute which authorized the Secretary of Revenue to suspend the motor vehicle operating privileges of an uninsured motorist who was involved in an accident resulting in bodily injury or property damage exceeding $200 and who failed to deposit security sufficient to satisfy any judgment which may be recovered against him. In that case the court held that it was bound by the holding of the Supreme Court in *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) where that Court held that procedural due process [8] in a license suspension under a similar Georgia statute will be satisfied by an administrative hearing which includes an inquiry limited to a determination whether there is a reasonable possibility of judgments in the amounts claimed being rendered against the licensee. The Pennsylvania statute made no provision for such an inquiry; but the Secretary argued that *Bell v. Burson* was satisfied by a

---

8. Of course, procedural due process is not a Sixth Amendment right, however it is a con-

stitutional right, as is the right of confrontation.

combination of the availability of a *de novo* judicial proceeding and the supersedeas effect of a timely appeal. The three-judge court first called attention to the difference between an administrative hearing and a criminal case:

There is no doubt that *Bell v. Burson*, *supra*, does not demand the full panoply of a due process hearing *such as is required for entry of a formal judgment in court or a conviction in a criminal case* . . . .

*Id.* at 245 (emphasis added). The court then held that even with respect to administrative hearings:

The record in this case together with the holdings of the United States Supreme Court in recent years shows that an appeal to the common pleas court with a *de novo* trial is not a satisfactory method of according operators due process of law.

※　　※　　※　　※　　※　　※

For our present purposes it is sufficient to say that Pennsylvania at the present time has adopted no statute or rules and regulations to comply with *Bell v. Burson*. It relies almost entirely upon administrative procedures which are inadequate and the right of trial *de novo* when as a practical matter, most of these decisions are made at the adminis-

trative level.[9] This is not a satisfactory procedure for affording due process. *Id.* at 247–48.

The bottom line is that, whatever the requirements of *Bell v. Burson* might—or might not—be, they apply to administrative hearings and not to criminal cases such as those being heard by Respondent on the day in question. It is clear, then, that provision for a trial *de novo* in the event an appeal is taken from a conviction in Judge Evashavik's court does not cleanse or cure that procedure of its inherent unconstitutionality.

As I have said earlier, I agree with the majority's evaluation of Judge Marraccini's rulings on the admissibility of Chief Wood's readings as constituting no violation of the Pennsylvania Constitution or the Rules Governing Standards of Conduct of Magisterial District Judges.

However, this Court's omission to make it known that Judge Evashavik and Chief Wood were wrong to think that Rule 454(B) authorized the use of a "reader" when it clearly does not, unfortunately leads to the conclusion that they weren't wrong—it's just that Judge Marraccini wasn't wrong either. And if they were wrong—so obviously wrong—I believe the magisterial district judges who hear these cases daily are better served if this Court makes that clear[10]—rather than leaving

**9.** Here the court is referring to its findings, noted earlier in the opinion, that: "The brute fact is that suspensions under Section 1404 are determined administratively: of approximately 56,000 Section 1404 suspensions in an eight-month period, 179 persons petitioned for trial *de novo* in court." *Id.* at 245. While no statistics on the incidence of appeals to common pleas court from convictions in traffic cases are part of this record, experience tells us that the incidence would relate closely to the experience in the license suspensions referred to in *Kilfoyle*. It is also certain that the necessity to pay a filing fee as well as the necessity (or at least the strong advisability) of

having legal representation in any appeal from conviction of a violation of the Motor Vehicle Code provide the same disincentive to appeal as those considerations do, as mentioned in *Kilfoyle*, in the case of appeals from license suspensions.

**10.** It is suggested, see Concurring and Dissenting Opinion, Panepinto, J., p. 402, that the canons of adjudicative methodology discountenance the questioning of the constitutionality of a rule or statute and require that the rule or statute be interpreted so as to preserve its constitutionality if at all possible. 1 Pa.C.S.A. § 1922(3). Nowhere in this con-

the point susceptible of a contrary interpretation, i.e., that it is perfectly acceptable for convictions in traffic cases to be had simply by having some third party "reader" reciting the affidavits of absent witnesses.

Finally, I must say that, as I listened to the testimony in this case, it took awhile for it to sink in that what the police were proposing—demanding—here was a system of justice which would permit citizens to be convicted without any witness being presented to establish the case against them. I was struck by the unfairness of it all—by the unfairness of a system which would require citizens to show up for trial (no matter how meritless the charge might be) under pain of automatic conviction, while at the same time attaching no consequences to the absence of the police who can obtain convictions whether they show up or not. I wondered how the police (and the judges who hold traffic court) would react to a proposal that the citizen-defendants need not appear if they didn't want to and have some stand-in "testify" for them. After all, there's no reason to think that it is any less inconvenient for the citizen to take a day off from work (or a half day) than it is for a policeman. Actually, as we know, many traffic tickets are issued to citizens who live at a distance from the courthouse [11] for whom of course, it is a much greater hardship to attend than it is for the local police officer.

I did not want to believe that a rule of our Supreme Court could permit such a system of justice as the Judicial Conduct Board and Chief Wood were insisting it did. I hope that what I have written

reveals that it does not. Besides being unfair, it also happens to be unconstitutional. If Judge Marraccini had acceded to Chief Wood's demands he would have been violating the rights of the defendants; as it was, his actions that morning were singularly directed at protecting those rights.

It is for these reasons that, while I join in the rulings of the majority, I have proceeded to this concurring opinion.

## CONCURRING AND DISSENTING OPINION BY Judge PANEPINTO.

Initially, I must note that I do not concur with the conclusion concerning Pennsylvania Rule of Criminal Procedure 454(B). Suffice to say, I do not agree with the rationale concerning the interpretation and implementation of the rule. Pennsylvania Rule of Criminal Procedure 454(B) has been in place for some time now and has been used to permit an official, such as Chief Wood herein, to read into the record the summary traffic citation that is at issue. However, I do not believe that the constitutionality of Rule 454(B), or the manner in which it is construed, has any bearing on our decision in this case. Respondent must make decisions based upon the application of various rules that are before him such as the applicability of Rule of Criminal Procedure 454(B). It was Respondent's determination that Rule 454(B) did not permit the reading into the record of the various citations by the police official in the courtroom. Respondent had the responsibility to make this determina-

---

curring opinion are these principles disserved. On the contrary, as is specifically noted *supra,* p. 395, Rule 454(B) is interpreted in this opinion so as to preserve its constitutionality. It is the uncalled for and unwarranted *misinterpretation* of the rule by Judge Evashavik, as sought to be implemented by

Chief Wood, which raises the constitutional issues which confronted Judge Marraccini and which are discussed herein.

**11.** It has even been suggested that some police departments have been known to "target" out-of-towners.

tion and I do not believe we have any authority to second guess his legal determination. I also do not believe the charges brought before our court should concern the issue of validity or the constitutionality of Rule 454(B).

However, it is the manner in which the Respondent conducted himself which causes me to question his conduct. In reviewing the testimony, it appears that Respondent made a determination that (1) none of the police officers who wrote the various citations were going to appear in Court that day (from an outside the courtroom source—Judge Evashavik) and (2) no other evidence was going to be put forth by the Commonwealth with respect to these citations. Based upon the above, Respondent determined that all of the citations would have to be dismissed for lack of evidence. While it appears that Chief Wood seemed to pressure the Court to read the citations, Respondent believed he should not and would not follow this procedure. I believe Respondent has a right to make the final call on this ruling in his courtroom. However, I believe Respondent had an absolute obligation to call each of the cases scheduled that day and make a case by case determination as to whether or not any evidence would be presented by the Commonwealth. Respondent, despite the information he was provided by Judge Evashavik, had an absolute obligation to determine for himself whether or not any of the police officers who had written the citations were in the courtroom that day. He failed to do this. This caused defendants who were expecting a hearing to be confused and upset at the events which occurred that day. They were even confused who the Judge was and if they were brought into Court one by one, the problems for this Respondent would probably not exist. Whether he decided to dismiss

the case or not would not be an issue before us now. Unfortunately, Officer Quinn was in the courtroom and had written several of the citations that were being heard that day. However, Respondent did not address this point with Officer Quinn or any Commonwealth representative that day and, therefore, several citations were dismissed which otherwise may have been heard and ruled upon on the day he presided in Court. It is for this reason that I must differ with the majority Opinion and find that Respondent's conduct on the morning of May 25, 2004, while in the courtroom, constituted conduct which brings the judicial office into disrepute, which is a violation of Pa. Const., Article V, § 18(d)(1) (Count 3). The majority Opinion acknowledges the violation in Count 3 but only considers it a violation which brings the judicial office into disrepute for conduct occurring outside the courtroom. I think the violation based on the evidence occurs in and outside the courtroom for his failure to consider each case on its own merits. This failure to give attention to each case is what the litigants were upset about, and actual witness testimony about the Judge's behavior and manner of dismissal combines to bring the office of Judge into disrepute. This type of behavior and en masse dismissal of cases without a hearing is exactly what hurt this Respondent and caused him and the office of Judge to be held in disrepute.

The determination that Respondent's conduct on the morning of May 25, 2004 in the waiting area, on its face and by credible actual witness testimony, constituted a failure to be patient, dignified and courteous to litigants, witnesses and others with whom he deals in his official capacity. This is also a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 5).

In conclusion, I concur in part and dissent in part to the majority Opinion for all of the above reasons.

Respondent is subject to discipline for Count 3 and Count 5 under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## ORDER

PER CURIAM.

AND NOW, this 2nd day of October, 2006, after hearing held on September 28, 2006 on the issue of sanctions, and upon consideration of statement by counsel for the Respondent and by the Respondent himself, and upon the record of the trial of this case, it is hereby ORDERED that the Respondent is REPRIMANDED.

MUSMANNO, J., did not participate in the consideration or disposition of this case.