**In re Gerard L. ALONGE, Magisterial District Judge, Magisterial District 06–3–02, Erie County.**

**No. 4 JD 09.**

Court of Judicial Discipline of Pennsylvania.

June 18, 2010.
Sanctions Order Issued July 21, 2010.

---

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and, if so, issue an Order setting a date for such oral argument. If the Court determines not to entertain oral argument upon the objections, the Findings of Fact and Conclusions of Law shall become final and this Court will conduct a hearing on the issue of sanctions,

That, in the event objections are not filed within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will conduct a hearing on the issue of sanctions.

OPINION BY Judge JAMES.

Joseph A. Massa, Jr., Chief Counsel, Judicial Conduct Board, for the Judicial Conduct Board.

Philip B. Friedman, Erie, for Respondent.

Before KURTZ, P.J., JUDGE, SR., JAMES, MORRIS, CURRAN, ROBINSON, and McGINLEY, JJ.

## ORDER

AND NOW, this 18th day of June, 2010, based upon the Findings of Fact and Conclusions of Law, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law is hereby filed and shall be served on the Judicial Conduct Board and upon the Respondent,

That either party may file written objections to the Court's Findings of Fact and Conclusions of Law within ten (10) days of the Order. Said objections shall include the basis therefor and shall be served on the opposing party,

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on July 6, 2009 against Magisterial District Judge Gerard L. Alonge (Respondent) consisting of two counts.

Count 1 charged that Respondent had violated Article V, § 18(d)(1) of the Pennsylvania Constitution by engaging in activity which brought the judicial office into disrepute.

Count 2 charged that Respondent had violated Rule 15(D)(3) of the Rules Governing Standards of Conduct of Magisterial District Judges by misrepresenting his qualifications while campaigning for his present judicial position. Upon motion of the Board the Court permitted the withdrawal of the charges in Count 2 for good cause shown.

Upon motion of the Board the Court permitted the withdrawal of certain allegations in Count 1, *viz.*, those contained in paragraphs 3–7 and 34–53 of the Complaint for good cause shown.

The charges in Count 1 arise from conduct of Respondent which consisted in his making repeated and persistent telephone calls to five women which calls were unwanted, unsought, and unwelcome. In addition, in some cases Respondent appeared at the office or home of the women uninvited and unannounced.

After trial the Court finds that the Board has established by clear and convincing evidence that the Respondent's conduct is such that brings the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

## II. FINDINGS OF FACT

### A. INTRODUCTORY

1. The Board is empowered by Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania to file formal charges alleging misconduct on the part of a justice, judge or magisterial district judge, and to present the case in support of the formal charges before the Pennsylvania Court of Judicial Discipline.

2. Respondent was elected as a magisterial district judge of Magisterial District 06–3–02, Erie County, Pennsylvania in November 2005. He was sworn in as a magisterial district judge on or about January 3, 2006 and has served continuously to the present in that position.

### B. HEATHER PURCELL

3. Heather Purcell (hereinafter Purcell) is an adult female, who at all relevant times resided in Waterford, Erie County, Pennsylvania. Ms. Purcell received her Bachelor of Arts degree from Washington and Jefferson College and her JD degree from the University of Pittsburgh. She received her JD degree in 2001. (Purcell, N.T. 4–5).

4. At all relevant times, Purcell was employed by the County of Erie as court solicitor and judicial law clerk to the Honorable Elizabeth K. Kelly. (Purcell, N.T. 6).

5. At all relevant times Purcell was married and was the mother of 18–month old twins. (Purcell, N.T. 17, 20)

6. In January 2008 Purcell received a telephone call at her office from Respondent who was calling with a question about marriage ceremonies. (Purcell, N.T. 9). At the time Purcell had never met Respondent and he was not known to her. (Purcell, N.T. 10).

7. Purcell described the telephone conversation as follows:

Q. And during the course of the conversation, did Judge Alonge ask you any specific questions?

A. He asked the question regarding the marriage ceremonies, and I referred him to the appropriate statute to answer his question.

And then I don't remember how it took a turn, but the conversation just started to get into my background and personal information, personal questions.

Q. Such as?

A. I recall him asking me where I went to school, my education and my prior work experience. Nothing else—nothing really stands out about it except for the fact that it was unusual that we had somehow shifted from me answering a legal question to the personal questions. (Purcell, N.T. 10).

8. After the telephone call Purcell told Thomas Aaron, the District Court Administrator for Erie County, of the conversation she had with Respondent and asked if he really was a magisterial district judge. (Purcell, N.T., 12).

9. Aaron told Purcell to let him know if Respondent ever called her again. Respondent did call and Purcell did tell Aaron. (Purcell, N.T. 12).

10. Two weeks later Respondent called Purcell and told her he would be serving as a judge in a moot court competition and asked if she would like to be his law clerk for the day. Purcell considered Respondent's conduct "beyond unusual" and was "somewhat offended." She did not accept Respondent's invitation to be his "law clerk for the day." (Purcell, N.T. 14).

11. Purcell told Aaron of their conversation and he told her to start taking notes of any further contacts with Respondent. (Purcell, N.T. 15).

12. Two days later Respondent showed up unannounced at Purcell's office in the courthouse; they had a five minute conversation about nothing in particular during which Respondent continuously looked at Purcell's ring finger on which she wore a wedding ring. This made Purcell "uncomfortable." (Purcell, N.T. 17, 20).

13. Five days later Respondent again appeared at Purcell's office, again unannounced, and stated he had something he wanted to tell her but he said that she had "made him feel shy" at their earlier meeting and, as a result, he hadn't told her. It is unclear what he wanted to tell her. On this occasion Respondent told Purcell that the magisterial district judge serving in the district where Purcell lived was planning to retire and that she should run for that office. (Purcell, N.T. 19–20).

14. Purcell had never told Respondent where she lived. (Purcell, N.T. 21).

15. During this conversation Respondent looked at her ring finger and asked if the ring she was wearing was an engagement ring. Purcell told him it was a wedding ring. (Purcell, N.T. 20).

16. A month later Respondent again called Purcell at her office leaving a message asking her to call him. Purcell did not return the call. (Purcell, N.T. 24).

17. Respondent's conduct Purcell regarded as "beyond unprofessional" and "weird." (Purcell, N.T. 24).

## C. ERIN CONNELLY

18. Erin Connelly (hereinafter Connelly) is an adult female who received her JD degree from Duquesne University in 2003. (Connelly, N.T. 4).

19. At all relevant times Connelly was employed as an assistant district attorney in Erie County. (Connelly, N.T. 4).

20. Connelly's duties as assistant district attorney occasionally required her to be in Respondent's court. (Connelly, N.T. 6).

21. Some time after Respondent took office he began making frequent calls to Connelly:

Q. Who initiated those telephone calls?

A. Judge Alonge.

Q. What was the nature of those telephone calls?

A. Just general.

Q. Do you recall a typical conversation?

A. I don't recall it specifically. The only thing I specifically recall is they happened often, not everyday, but he would call. And if I called him Judge Alonge or said hi, Judge, he would always tell me to call him Gerry. And I recall him asking me to go to lunch on one occasion. (Connelly, N.T. 7).

22. These phone calls, including Respondent's insistence that Connelly call him "Gerry," the invitation to lunch, and Respondent's general unprofessionalism, made Connelly uncomfortable in Respon-

dent's courtroom and she would not enter Respondent's office unaccompanied. (Connelly, N.T. 8–9).

Q. Did you ever take any steps to have anyone with you when you were at his Court?

A. There would always be a Police Officer, usually a State Trooper out there when I had to go out to Court, whoever the affiant was in the case. If the Judge would say, which he would often say, come on in, see my office, I want to show you something, and I would make sure the Trooper went in with me.

Q. Why?

A. I wouldn't go in there by myself.

Q. Why? Why not?

A. I was just uncomfortable. I didn't want to get into a situation—I just didn't want to put myself in a position where anything could happen. (Connelly, N.T. 8–9).

23. Connelly was so uncomfortable with Respondent that she reported the situation to another assistant district attorney and to her father. Her father, Shad Connelly, happened to be a judge of the Court of Common Pleas of Erie County. (Connelly, N.T. 9–10), (Shad Connelly, N.T. 4–5).

24. Judge Connelly reported the situation described by his daughter to Brad Foulk, District Attorney of Erie County, after which Connelly was not assigned to Respondent's court for a period of time. (Connelly, N.T. 10), (Shad Connelly, N.T. 6).

## D. HALLIE DEMARCO

25. On October 12, 2006, Hallie DeMarco (hereinafter DeMarco), then age 17, appeared before Respondent having been cited for underage drinking. DeMarco and her mother met with Respondent in his office, and a disposition was worked out. (N.T. 18–20). During the meeting, DeMarco happened to mention her interest in soccer to Respondent and he told her that he was a soccer coach at Mercyhurst College in North East. This interested DeMarco, since she played soccer in high school. Respondent offered to show DeMarco the college campus, and he said that he would give her a ride to the campus since she was too young to have a driver's license. (N.T. 24).

26. In March 2008, DeMarco encountered Respondent at a community social event, and Respondent told DeMarco he had an opportunity for her. (N.T. 22–25). Respondent invited DeMarco to come to his office to talk about it. DeMarco, thinking that Respondent was talking about an opportunity for employment or schooling, met with Respondent for approximately 45 minutes in his private office. (N.T. 27–32).

27. On that occasion Respondent escorted DeMarco into his office and instead of talking about "a great opportunity," made small talk with DeMarco and told her several times how he had been "struck" by her appearance. He complimented her on her pretty eyes and the pretty curls in her hair. (N.T. 29–30).

28. When DeMarco asked what the "opportunity" was that he had referred to, Respondent mentioned the possibility of hiring DeMarco as one of his office workers on a per diem basis to fill in when an employee was absent. DeMarco said that she was not interested. (N.T. 30–31).

29. Respondent never followed through on his offer to help DeMarco with soccer at Mercyhurst–North East. (N.T. 31).

30. The conversation ended and the Respondent said, "Don't be a stranger, keep in touch, here is my card." (N.T. 33).

31. Thereafter Respondent called DeMarco on her cell phone quite often—

sometimes a couple of times a day. (N.T. 33, 35).

32. DeMarco worked part-time as a waitress at a club known as the Brotherhood of St. Joseph. On a couple of occasions Respondent would come in by himself and sit there. (N.T. 22, 34).

33. On one occasion Respondent called DeMarco when she was home with her father and brother, and her brother took the phone from her and told Respondent he was not too happy about Respondent's telephone calls to his sister. (N.T. 35–36).

## E. KARI FROESS

34. Kari Froess (hereinafter Froess) is an adult female who was admitted to the bar in 2004. In August 2006, she became employed at the Steadman law office in Girard, Pennsylvania, located just south of the City of Erie, Pennsylvania, where she worked until December 2007. She first met Respondent in November 2006 at a brunch for the new members of the Erie County Bar Association. (N.T. 66–68).

35. Froess's next contact with Respondent was in January 2007 at a meeting of the Young Lawyers Division of the Erie County Bar Association of which Froess was co-chairman. Froess was engaged in organizing a mock trial. Respondent approached her and said he wanted to participate in the trial. Since Respondent was not a lawyer she was unsure as to how much participation he could have in the program and referred him to another person. Thereafter, during the entire year 2007, Respondent called Froess repeatedly on the telephone. (N.T. 69–72)

36. Sometime in 2007, Froess was in her office at the Steadman law firm in the early afternoon when she was notified by her secretary that Respondent was there to see her. Respondent's visit was unannounced and unexpected. Froess had Re-spondent shown to her office where they spent about 15 minutes in conversation. Respondent spoke about mock trials and other irrelevancies such as how Froess's day was going. He said he heard Froess had purchased a new home. Froess, in fact, had purchased a new home but had not told Respondent that she had. (N.T. 74–76).

37. Thereafter, Respondent continued to call Froess on the telephone even though Froess knew there was no legitimate purpose for the calls. Eventually Froess instructed her secretary that she would accept no calls from Respondent. In response to information Froess learned from her secretary, which information Froess considered a threat to her job security, Froess immediately went to her boss, Attorney Steadman, and described the situation to him and explained why she was not accepting calls from Judge Alonge. (N.T. 77–78).

38. In December 2007, Froess left the Steadman law firm and went to work at the Carney and Good law firm. Respondent called her again at her new office on one occasion. (N.T. 79).

## F. JULIA DUDICS BAGNONI

39. Julia Dudics Bagnoni (hereinafter Bagnoni) is an adult female who was admitted to the bar in February 2006. (N.T. 88).

40. At all relevant times Bagnoni was unmarried and the mother of a two and a half year old son, was employed as a part-time assistant public defender in Erie County and also conducted a private law practice out of her home. (N.T. 88–89). Her work for the public defender required her to be in Respondent's courtroom from time to time. (N.T. 104).

41. Bagnoni met Respondent at an Erie County new attorneys swearing in

ceremony in 2007. (N.T. 88–89). Months later, on October 30, 2007 at about 7 p.m. Bagnoni drove her automobile into the driveway of her home which was some 17 miles from Northeast, Pennsylvania where Respondent lived and worked. It was dark and it was raining. Bagnoni's two and a half year old son was in the back seat. As Bagnoni was getting out of her car another car pulled in the driveway right behind her. Bagnoni could not see who was in that car and did not know why the car was in her driveway. Bagnoni was frightened. (N.T. 89–93).

42. In a loud voice Bagnoni asked the driver of the other car if she could help him. At that point Respondent got out of the car and came toward her. Bagnoni then lifted her son out of the car and told him to get in the backyard. Respondent then told Bagnoni that he was the district justice from Northeast and that "he had come to meet the phenomenal and sensational attorney that he had heard so much about." Bagnoni recognized that this may have been intended as a compliment, nevertheless she felt threatened by the remark. Respondent went on to tell Bagnoni that even though Attorney Nicole Sloane had told him Bagnoni had blonde hair, he saw that her hair was not blonde but brunette, but that was "okay with him." Respondent told Bagnoni that he had been waiting for her to arrive for several hours. (N.T. 94–97).

43. Bagnoni had never given Respondent her address or her phone number or any other personal information. (N.T. 91).

44. Despite telling Respondent about 20 times that she had to go into the house, Respondent remained in the driveway for four to seven minutes chitchatting about Bagnoni participating in moot court with him. Respondent asked Bagnoni if he could call her sometime and she responded only if it is about business. Finally, Bag-

noni turned away from Respondent, totally ignoring him, went into the house and locked the door. Bagnoni immediately called Nicole Sloane and left a message on her voice mail asking why she would "sic this guy on me, why she would tell him that I lived there, why he thought 1 had blonde hair instead of brown hair, and basically what was going on." (N.T. 98–99).

45. The following day was Halloween. At 9:15 p.m. that night Respondent called Bagnoni. He asked how her son liked Halloween. He asked if her son got a lot of candy. He said there was nothing on TV and that he was bored. Bagnoni got off the phone and remarked to her boyfriend, who was there at the time, that "it appears as though I have a man freak on my hands." (N.T. 100–01).

46. The next day, November 1, 2007, Bagnoni received materials in the mail from Respondent. These was a complete copy of the Pennsylvania Bar Institute materials from a Criminal Law Seminar held on October 30 with a note from Respondent which said since you couldn't make it to the seminar I made you a copy. (N.T. 101–02).

47. A week later Respondent called Bagnoni at 9 p.m. and left a message that he was going out of town for a few days and he hoped he would hear from her soon. Bagnoni did not return the call, but sometime later did tell Respondent not to call her unless it had to do with business. (N.T. 102–03). Despite this, Respondent did call Bagnoni at her home at least 10 to 12 times usually on Friday or Saturday nights leaving no message. Bagnoni is able to identify Respondent as the caller by caller ID. (N.T. 109–10).

48. Bagnoni spoke to the chief public defender, Attorney Logue, and gave him a memo she wrote describing her encounters

with Respondent and asked that it be kept in her file.  (N.T. 103–05).

## III.  *DISCUSSION*

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

> All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence.  Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant.  The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const., Article V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

> The witnesses must be found to be credible, that the facts to which they testify and are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986).  *See, also, LaRocca's*

*Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a Panel to conduct the trial of this case.  The Panel, consisting of Conference Judge James, Judge Morris and Judge Curran, conducted the trial on April 12, 2010.  Findings of Fact were initially made by the Panel.

Since the Constitution requires that "all actions of the court . . . shall require approval by a majority vote of the members of the court" (Pa. Const., Article V, § 18(b)(4)) the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court.  Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obligated to accord special deference to the Panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

> As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as fact finder, we are precluded from overturning that findings and must affirm, thereby paying the proper deference due to the fact finder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted).

*Commonwealth Dept. of Transportation v. O'Connell*, 521 Pa. 242, 248, 555 A.2d 873, 875(1989).

As stated above, the charges here consist of one count which asserts that the Respondent's conduct set out in the Board's Complaint and testified to by the Board's witnesses is such that brings the

judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution. We find that Respondent's conduct was as described by the young women who testified at the trial. Their testimony stands uncontradicted and, in fact, Respondent does not dispute it. We find the Board's evidence to be clear and convincing. We further find that Respondent's conduct is such that brings the judicial office into disrepute.

This Court has been called upon frequently to decide whether particular conduct is such that—in the words of the Constitution—"brings the judicial office into disrepute." [1]  *See, In re Berry,* 979 A.2d 991, 996–97 (Pa.Ct.Jud.Disc.2009) where we set out a list of various conduct which this Court has, over the years, found to be such that brings the judicial office into disrepute.

In evaluating the conduct in each and every one of these cases the Court has consistently applied certain principles and tests in our determinations that any particular conduct was—or was not—such that brings the judicial office into disrepute. In all cases where those holdings have been reviewed by our Supreme Court, those holdings have been affirmed. *See, In re Berkhimer,* 593 Pa. 366, 930 A.2d 1255 (2007); *In re Harrington,* 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy,* 576 Pa. 224, 839 A.2d 182 (2003); *In re Cicchetti,* 560 Pa. 183, 743 A.2d 431 (2000).

These principles for assessing conduct as bringing the judicial office into disrepute were first set down in this Court's opinion in *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996). There we said:

It cannot be *presumed* that a violation of any other provision, constitutional, canonical or criminal *automatically* lowers public acceptance of the authority of the judicial office. (Emphasis the Court's). *Id.* at 1238.

This Court, therefore, has never *presumed* that a violation *automatically* brings the judicial office into disrepute. See cases cited *supra.*

In *Smith* we also first enunciated the principle that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

This Court, therefore, has, in every case, made an assessment of what it believed the reasonable expectations of the public would be as to the judicial officer's conduct involved in the particular case.

Again, in *Smith* we set down the principle, which we have consistently followed, that "the judicial officer [must have] engaged in conduct which *is so extreme*" that it brings the judicial office into disrepute. *Id.* at 1238. See cases cited *supra.*

In our opinion in *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) we held that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

*Id.* at 312. This prescript is hardly surprising and is realistically unavoidable in determining whether particular conduct brings the judicial office into disrepute in-

---

1. Pa. Const., Article V, § 18(d)(1). This section of the Constitution further provides that a judicial officer is subject to discipline for conduct which brings the judicial office into dis-

repute "whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law."

asmuch as these cases are driven by the facts and the facts are always different.

These principles for determining whether particular conduct brings the judicial office into disrepute have been approved, indeed adopted by our Supreme Court. *See, e.g., In re Berkhimer*, 593 Pa. 366, 372–73, 930 A.2d 1255, 1258–59 (2007) and *In re Cicchetti*, 560 Pa. 183, 206–07, 743 A.2d 431, 443–44 (2000).

With these principles in mind, then, we consider whether the conduct of this Respondent, set out in the Findings of Fact, is such that brings the judicial office into disrepute. We hold that it is.

While it cannot plausibly be maintained that Respondent's attentions to these young women were not extremely irregular, extremely out of the ordinary, bizarre and even "weird,"[2] one might be inclined to regard the conduct as perhaps annoying but essentially harmless, attributable to Respondent's crashing lack of any social fluency.[3] However, brief reflection leads to the realization, indeed, to the conviction, that Respondent's conduct cannot be excused or rationalized in such a fashion.

First of all, conduct of a judge which is bizarre and weird by itself certainly does not enhance the professionalism, the dignity or the reputation of the judicial office— of judges across the board. But this Respondent's conduct, bizarre and weird as it was, did not play to an empty house, it did not occur in a vacuum. There were five young women on the receiving end. And they were young—one, DeMarco, was only 17 years old who had been brought to Respondent's courtroom for underage drinking. The other four women were young, newly admitted lawyers, and we believe their status as lawyers and Respondent's status as judge makes Respondent's approaches to them significantly more coercive. In DeMarco's case, Respondent was abusing the perceived power of his office by deluding a 17 year old into believing he could do something for her.

Second, Respondent's conduct was not harmless. We regard Respondent's conduct as akin to "stalking." He made repeated phone calls to these women, mostly at night. He made the calls even after repeatedly being told not to call. He appeared uninvited and unannounced at the offices and homes of these women. In some cases he had obtained information about their personal lives and affairs which could only have come from a personal investigation conducted by Respondent.[4] This is beyond unsettling—this is scary. Two of the women lawyers, Connelly and Bagnoni, had jobs which required them to be in Respondent's court from time to time, and both were so concerned that their expressed disaffection with Respondent's attentions would have repercussions in his courtroom to the disadvantage of their clients, that they took steps to prevent that from happening.[5]

We must say, however, that, of all Respondent's conduct described at the trial,

---

2. See testimony of Heather Purcell (Purcell, N.T. 24).

3. In fact, Respondent's counsel so argues.

4. Purcell, Findings of Fact Nos. 13–14; Froess, Finding of Fact No. 39; Bagnoni, Findings of Fact Nos. 45–46.

5. Erin Connelly told her father, Judge Connelly, who advised the district attorney of his daughter's problem with Respondent. Julia Dudics Bagnoni advised her boss, the chief public defender, of her problem with Respondent and insisted that a memo on the subject be placed in her file. Heather Purcell advised the court administrator of Respondent's phone calls to her. In Connelly's case, Respondent's conduct was responsible for her reassignment to different courts, thus Respondent's conduct actually affected the judicial system itself.

we find most remarkable Respondent's encounter with Julia Bagnoni on the dark, rainy night of October 30, 2007. On this occasion, Respondent waited in his car in front of Bagnoni's home, in the dark, and in the rain, for several hours, for the arrival of a woman he had never met! And he told her that! If she found that creepy or spooky, we would understand; Bagnoni said she was "kind of pissed off to tell you the truth" (N.T. 97), and we understand that. Bagnoni drove her car into the driveway of her home and Respondent pulled in right behind her—as if Respondent was an old friend or a member of the family. She had no idea who he was or what he was doing in her driveway. She had her two year old son in the car and she was concerned for him as well as for herself. She said she was "apprehensive" and felt "threatened." Respondent got out of his car and moved toward her and the child, finally identifying himself as the district justice from Northeast and adding the inane remark that he "had come to meet the phenomenal and sensational attorney that he had heard so much about." There followed an interlude of four to seven minutes during which Respondent chatted on in the rain about irrelevancies, all the while Bagnoni retreating toward her back door, followed by Respondent step by step. The episode concluded when Bagnoni turned her back on Respondent and went in the door and locked it. (N.T. 92–101, 107). We regard this conduct of Respondent as preposterous and certainly as demonstrating an appalling lack of judgment and good sense.

Respondent apparently didn't get the message that his nocturnal visit to Bagnoni was unwelcome for he called her the very next night, which was Halloween, to ask if her son "got a lot of candy." (N.T. 100, 108). In the weeks following, Respondent telephoned Bagnoni repeatedly, usually at night, even after she told him not to call. (N.T. 101–03).

Scrutinizing and weighing the conduct of Respondent in this case it is impossible for us not to find that Respondent's conduct is antithetical to the reasonable expectations of the public as to how a judicial officer should conduct himself. We also find that Respondent's conduct was so extreme that it brings the judicial office into disrepute.

In the course of our consideration of whether Respondent's conduct in this case is conduct which brings the judicial office into disrepute we note the similarity of this Respondent's conduct with that of the Respondent in *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) in which case this Court found that the conduct there at issue was such that brings the judicial office into disrepute, which holding was affirmed by our Supreme Court, 560 Pa. 183, 743 A.2d 431 (2000). In that case the Respondent was the president judge of Fayette County. The complainant was a female probation officer who was assigned to the Respondent's courtroom for criminal cases. She testified that, *inter alia*,

— Respondent repeatedly called her into his robing room and spoke to her about personal matters such as:

  — what kind of car she drove

  — what she liked to do on weekends

  — whom she dated

  — how many boyfriends she had

  — if it was true blondes had more fun

  — whether they could get together

— Respondent repeatedly called her on the telephone, which calls were unwelcome,

— Respondent remarked about her build on one occasion and asked if she wanted to go to law school or become a magistrate and told her he could help her in either case,

— This conduct persisted over an eight-month period.

Of course, Cicchetti's conduct was not exactly the same as this Respondent's; but it is the same kind of conduct: annoying, persistent, intimidating, harassing. It was these elements of Cicchetti's conduct which this Court and the Supreme Court found qualified the conduct as such that brings the judicial office into disrepute in violation of the Constitution. So, we find, as we did in *Cicchetti* that "this Respondent's behavior … was so persistent, so coercive and so extreme that we conclude that disrepute was brought on the judicial office itself." *In re Cicchetti*, 697 A.2d at 312.

## IV. *CONCLUSIONS OF LAW*

1. The conduct of Respondent is such that brings the judicial office into disrepute.

2. The Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## ORDER

AND NOW, this 21st day of July, 2010, after hearing on the question of sanctions, it is hereby ORDERED that Respondent is SUSPENDED from his judicial office WITHOUT PAY for a period of sixty (60) days commencing August 1, 2010, and Respondent is placed on probation until December 31, 2011. During said probation Respondent shall continue with the medical care of Dr. Thomas Gustin and Dr. Lamar J. Neal as described in the testimony of Dr. Lamar J. Neal given by videotape at the sanction hearing. The Judicial Conduct Board shall provide this Court with monthly reports in which it shall certify as to Respondent's compliance with the aforestated conditions of probation.

Respondent's entitlement to any medical benefits shall not be affected by this Order.

Judge ROBINSON concurs with his sanction order in every respect except he would impose suspension without pay for a period of thirty (30) days.