**In re Willie F. SINGLETARY, Former Traffic Court Judge, Philadelphia County.**

Court of Judicial Discipline of Pennsylvania.

Oct. 9, 2012.

Sanctions Order Issued Dec. 13, 2012.

Before CURRAN, P.J., McGINLEY, CLEMENT, JR., CELLUCCI, and McCUNE, JJ.

## ORDER

AND NOW, this 9th day of October, 2012, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent;

That either party may elect to file written objections to the conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party;

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument;

That, in the event objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

PER CURIAM.

## ORDER

OPINION BY Judge McCUNE.

## I. *INTRODUCTORY STATEMENT*

The Judicial Conduct Board (Board) filed a Complaint with this Court on March 1, 2012 against Former Philadelphia Traffic Court Judge Willie F. Singletary (Respondent). The Complaint charges Respondent with violations of:

1. Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 1),

2. Article V, Section 17(b) of the Pennsylvania Constitution (Count 3), and

3. Article V, Section 18(d)(1) of the Pennsylvania Constitution (Count 2).

The Board and the Respondent have submitted Stipulations of Fact pursuant to C.J.D.R.P. No. 502(D)(2). The Court has accepted these Stipulations which are set out below as Findings of Fact Nos. 1–55.

## II. *FINDINGS OF FACT*

1. On January 4, 2012, the Judicial Conduct Board issued a Notice of Full Investigation to Respondent, to which Respondent replied on February 3, 2012.

2. On February 16, 2012, counsel for the Judicial Conduct Board deposed Respondent.

3. On March 1, 2012, the Judicial Conduct Board served a Board Complaint on Respondent.

4. In its Complaint, the Judicial Conduct Board alleged that Respondent's conduct in showing F two offensive photographs, as he showed her other photographs on his phone, violated Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges, Article V, § 17(b), and Article V, § 18(d)(1) of the Pennsylvania Constitution.

5. Respondent, through counsel, served his Answer to Board Complaint on March 30, 2012.

6. Thereafter, Respondent and the Judicial Conduct Board engaged in discovery pursuant to Chapter 4 of the Court of Judicial Discipline Rules of Procedure.

7. After reviewing the documents and information produced in discovery, Respondent and the Judicial Conduct Board agreed to the Proposed Stipulations of Fact set forth below.

8. Respondent served as a judge on the Philadelphia Traffic Court from January 7, 2008 to February 27, 2012. Traffic Court is located at 800 Spring Garden Street,

Philadelphia, PA.

9. Traffic Court judges are assigned to night court duty on a rotating one-week basis.

10. Respondent was assigned to night court duty during the week beginning December 19, 2011. On the afternoon and evening of December 19, 2011, Respondent was hearing cases in Impoundment Court.

11. The Philadelphia Parking Authority ("PPA") subcontracts with PWRT Services, Inc. ("PWRT"), which provides collection services for PPA at Traffic Court.

12. "F," a twenty-two year old female employee of PWRT, was assigned as a cashier at Traffic Court's location at 800 Spring Garden Street to collect PPA fees for booting, towing, and impoundment operations.

13. During the week beginning December 19, 2011, F was assigned to work from 1:00 p.m. to 8:00 p.m. at Cashier Station 16.

14. The cashier stations are separated from the public. Each station has a window through which the cashier interacts with the PPA customers. Cashier Station 15 was to F's right, and Cashier Station 17 was to her left.

15. A doorway from Impoundment Court leads into the area behind the cashier station.

## Events of Monday, December 19, 2011

16. On the evening of Monday, December 19, Impoundment Court was not very busy. For large parts of the evening, F had no customers and Respondent had no cases.

17. The Traffic Court video from Security Cameras 11, 12, and 13 depicts the events at issue which occurred on December 19, 2011 between 5:19 p.m. and 6:43 p.m.

18. The Traffic Court video has no audio.

19. The Traffic Court video was taken in the course of regular business, and was provided to Respondent's counsel through the discovery process.

20. During the events described below, Respondent was not adjudicating cases. None of the events recounted below involved hearings or trials or members of his court staff. Respondent was not wearing his judicial robe, was not dealing with parties or counsel, and was not interacting with members of the public. He was, however, on night court duty throughout the time period at issue.

21. At approximately 5:21 p.m. [2:30], [references in brackets are to the time clock on the videos produced by Christopher Waters, Traffic Court Computer and Finance Manager, and titled "Singletary 5.19 PM–6.45 PM"], Respondent approached F's cashier station. According to the Traffic Court video:

  a. Respondent approached F while she was waiting on customers at Cashier Station 16.

  b. As Respondent approached, at approximately 5:21:32 p.m., she held her cell phone out to him.

22. From to approximately 5:21:37 p.m. [2:35] to 5:25:24 p.m. [6:22], Respondent looked at F's phone while standing in Cashier Station 15, directly adjacent to F. During that time:

  a. F handed her phone to Respondent;

  b. On two occasions, F unlocked her phone and handed it back to or left it with Respondent;

  c. F pointed at things on her phone while Respondent held it;

  d. F took her cell phone back from Respondent and placed it on the counter of Cashier Station 16 near Respondent; and

  e. Respondent reached into F's work space at Cashier Station 16 and picked up F's cell phone again from the counter.

23. At approximately 5:25:24 p.m. [6:22], Respondent walked to Cashier Station 18 (two stations to F's left) with her phone.

24. From approximately 5:25:30 p.m. [6:28] until 5:36:52 p.m. [17:50], Respondent sat in Cashier Station 18, talking with F (and, at times, with Traffic Court Supervisor, Mary Adams) and looking at F's phone, until he set it down, picked up his own cell phone, made a call on his phone, and then left with his court officer.

25. During the above time period, Mary Adams delivered paperwork to Respondent. She returned a short time later to retrieve the paperwork.

26. At approximately 5:36:52 p.m. [17:50], Respondent left F's cell phone on the desk at Cashier Station 18. His court officer returned and chatted with F.

27. At approximately 5:40 p.m. [21:04], Respondent again sat at Cashier Station 18, talking on his cell phone, talking with F, and, at times, talking with the Traffic Court supervisor.

28. Respondent's discussions with F during the time period described above included Respondent's statements that he thought F was "a beautiful young lady," that he "would like to go out with" her, and they might choose to have an "intimate relationship." "But whatever we do, it has nothing to do with Traffic Court. You're an adult, I'm an adult. It's a private matter." Additionally, he told her that, alternatively, he "could be a friend there for you if you need somebody to talk to or if you need help in any other area that I can help you in, whatever that might be," including "a ride somewhere" or "helping paying a bill or anything."

29. At approximately 5:53 p.m. [32:40], Respondent returned to and stood at Cashier Station 17.

30. At approximately 5:53:19 p.m. [34:17], Respondent moved to Cashier Station 16, directly behind F's desk chair, and showed her photographs on his cell phone.

31. From approximately 5:53:19 p.m. [34:17] to 5:54:16 p.m. [35:14], Respondent scrolled through the "camera roll" on his phone, showing F pictures. He showed F twenty-five photographs and scrolled past three videos:

a. Himself and his mother (Picture No. 42);

b. Ten pictures of his daughters at Dave & Busters (Picture Nos. 41–32);

c. His daughters and niece in a Jacuzzi at the Poconos (Picture No. 31);

d. Three pictures of himself posing formally (Picture Nos. 30–28);

e. Himself with Michael Jackson's Hollywood star (Picture No. 27);

f. Himself with Stevie Wonder and Noel Jones, a "big-time" bishop in California (Picture No. 26);

g. His sneakers (Picture No. 25);

h. Two animated videos (Nos. 23 and 24);

i. Three pictures of a friend and her daughter at a computer (Picture Nos. 22–20);

j. Another animated video (No. 19);

k. A friend (Picture No. 18);

l. Two pictures of another friend dressed to go to a nightclub, which he "didn't stay on too long" because she was wearing black "booty" shorts (Picture Nos. 17–16); and

m. A picture of his head (Picture No. 15).

32, Immediately after the twenty-fifth picture, Respondent showed F two pictures of his erect penis, located between pictures 15 and 14 as they existed on December 19, 2011.

33. Those two pictures were part of a previous "sexting" exchange between Respondent and another woman.

34. The two pictures were on the screen of his phone for only a matter of seconds.

35. Respondent states that, at the time, he did not recall that these photographs were on his phone, and he did not realize that he would be showing them to F. The Board has no facts to dispute his statement.

36. No copy of the two pictures currently exists because Respondent deleted them from his cell phone after he showed them to F.

37. After having shown F the pictures, Respondent stepped back from F and into Cashier Station 15.

38. Moments later, at approximately 5:54:51 p.m. [35:49], he returned to Cashier Station 16 and again stood behind F, leaned in closely, and showed her fourteen additional photographs on his phone, including the following:

a. Four pictures of himself with a female friend (Picture Nos. 14–11);

b. A picture of another woman (Picture No. 10);

c. A picture of his church (Picture No. 9);

d. Six pictures of parking signs and his car (Picture Nos. 8–3);

e. Another picture of himself (Picture No. 2); and

f. Another picture of his church (Picture No. 1).

39. While they were looking at the second set of photographs on Respondent's cell phone, F pointed to things on Respondent's phone and discussed the photographs with him.

40. Then, at approximately 5:55:11 p.m. [36:09], a customer approached F at Cashier Station 16. Respondent returned to Cashier Station 15 while F waited on that customer.

41. After waiting on the customer, at approximately 5:57 p.m. [38:07], F picked up the office phone and dialed a friend who worked at the PPA Towing and Impound-ment Lot.

42. The Traffic Court video demonstrates that F spoke on the office phone for approximately twenty minutes.

43. Between approximately 6:16 p.m. [56:58] and 6:36 p.m. [1:16:58], Respondent returned several items to the Cashier Station near F. During this time, Respondent followed F to the PPA office and later approached her to make change from her cashier drawer. Respondent did not engage in improper physical (sexual or otherwise) contact with F, and he did not coerce her, threaten her, cause her to fear for her safety, or humiliate her in front of others.

**Events of Tuesday, December 20, 2011**

44. The next day, December 20, 2011, when F clocked in at 1:00 p.m., she asked Philadelphia Police Officer Felicia Williams, with whom F was friendly, for advice on how to handle someone who shows you a picture that you didn't like. F then explained the previous day's events to Officer Williams.

45. Officer Williams made a report to her supervisors, who reported the incident to Judge Glazer, Administrative Judge of Traffic Court.

46. Officer Williams also told F to contact her PWRT supervisor, which she did.

47. Judge Glazer told F that he needed to speak with her, and he arranged for her statement to be taken later.

**Events of Wednesday, December 21, 2011**

48. On Wednesday, December 21, 2011, F spoke with Officer Felicia Williams. Later, she spoke with Judge Glazer. She also spoke with her supervisor at PWRT. F became upset and her supervisor instructed her to go home for the day. Officer Williams was assigned to take F home.

49. Officer Williams went to Judge Glazer's chambers to obtain his phone number. While F waited for Officer Williams next to the impound courtroom chambers, Respondent saw that she was upset and crying.

50. Respondent called F into his chambers and she complied.

51. At the time, Respondent did not know that the photographs had made F

uncomfortable, or that F had reported that he had shown her the photographs.

52. Respondent asked F if PWRT was trying to fire her, and if so, he offered to call PWRT on her behalf.

53. Officer Williams then entered Respondent's chambers, escorted F out of Respondent's chambers, and took her home.

54. Respondent followed F and Officer Williams out of the Traffic Court building and to the car, while asking questions of Officer Williams.

55. Respondent resigned from the bench on February 27, 2012.[1]

### III. *DISCUSSION*

We will consider the charges in the order in which we listed them above.

*Count 1.* Violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

The Rules Governing Standards of Conduct of Magisterial District Judges deal separately with the "Adjudicative Responsibilities" of a district judge, covered in

Rule 4, and the "Administrative Responsibilities" of a district judge which are covered in Rule 5.

Rule 4 is entitled "Adjudicative Responsibilities." We think that is sufficient, by itself, to notify a reader that Rule 4 will be dealing with conduct occurring while a district judge is engaged in the discharge of his or her adjudicative responsibilities. Rule 4 has four sections: A., B., C. and D., and we set out all four to demonstrate how, in fact, all four do deal exclusively with adjudicative responsibilities. Rule 4 is as follows:

RULE 4. ADJUDICATIVE RESPONSIBILITIES.

A. Magisterial district judges shall be faithful to the law and maintain competence in it. They shall be unswayed by partisan interests, public clamor or fear of criticism.

B. Magisterial district judges shall maintain order and decorum in the proceedings before them. They shall wear judicial robes while conducting hearings or trials.

---

1. Although the point has not been raised by this Respondent, we note, as we did in *In re Pazuhanich,* 858 A.2d 231, 233 n. 1 (Pa.Ct. Jud.Disc.2004), that Respondent's resignation does not impair this Court's authority to impose discipline if warranted. *See, In re Melograne,* 571 Pa. 490, 812 A.2d 1164 (2002) where the Respondent's resignation was accomplished even before the disciplinary proceedings were commenced and the point was raised. In dealing with this issue, our Supreme Court said:

> The Court of Judicial Discipline exists to police the conduct of the judiciary and assure the public of the integrity of this branch of government. Were we to adopt Appellant's view of that court's power, the Court of Judicial Discipline would not be able to hear a complaint brought against a judicial officer who left office due to voluntary retirement, superannuation, or even

impeachment; such an overly restrictive definition of the court's authority would be in opposition to, rather than consistent with, the Court of Judicial Discipline's role. Thus, we would reject Appellant's argument and hold that the Court of Judicial Discipline has the power to sanction misbehaving judicial officers, regardless of whether they are in office during the pendency of disciplinary proceedings.

*Id.* at 496 n. 2, 812 A.2d at 1167 n. 2. *See, also, In re Sullivan,* 805 A.2d 71 (Pa.Ct.Jud. Disc.2002); *In re Larsen,* 717 A.2d 39, 43 (Pa.Ct.Jud.Disc.1998); *In re Cicchetti,* 697 A.2d 297, 301, n. 1 (Pa.Ct.Jud.Disc.1997); *In re Chesna,* 659 A.2d 1091 (Pa.Ct.Jud.Disc. 1995); *Matter of Glancey,* 518 Pa. 276, 542 A.2d 1350 (1988); and *Judicial Inquiry and Review Board v. Snyder,* 514 Pa. 142, 523 A.2d 294 (1987).

C. Magisterial district judges shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity, and shall require similar conduct of lawyers, of their staff and others subject to their direction and control.

D. Magisterial district judges shall accord to every person who is legally interested in a proceeding, or their lawyer, full right to be heard according to law and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. Magisterial district judges, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before them if they give notice to the parties of the person consulted and the substance of the advice and afford the parties reasonable opportunities to respond.

█ As can be seen from the Stipulations the Board's charge in Count 1 arises out of Respondent's activity between 5:21 p.m. and 5:55 p.m. on December 19, 2011 when Respondent was assigned to Impoundment Court. (Findings of Fact Nos. 10 and 21–40). The evening of December 19, 2011 was a slow evening at Impoundment Court and for large parts of that evening Respondent had no cases. (Finding of Fact No. 16). F, a twenty-two year old female employee of PWRT Services, Inc. ("PWRT") a company which provided collection services for the Philadelphia Parking Authority ("PPA") at Traffic Court, was assigned as a cashier at Traffic Court that evening to collect PPA fees for booting, towing and impoundment operations. (Findings of Fact Nos. 11–13). For large parts of the evening of December 19,

2011 F had no customers. Passing the time, Respondent and F entered into a conversation beginning at 5:21 p.m. The interaction between Respondent and F between 5:21 and 5:55 that evening was captured by several video cameras which were located in the cashiers' area and the tapes are in possession of the Board. (Finding of Fact No. 17).[2] The interaction between Respondent and F for the most part consisted in showing each other photos which they had earlier taken and which had remained stored in their respective cell phones. There was some general socializing during which Respondent told F he thought she was "beautiful" and "he would like to go out with her" and they might choose to have an "intimate relationship." (Findings of Fact Nos. 21–39).

However important (or however trivial) this tete-a-tete might have been in the lives of Respondent and/or F, it did not occur in the course of Respondent's adjudicative responsibilities. Consequently, it is not a violation of Rule 4C.

We have dealt with this issue before. In *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud. Disc.1997) the Respondent was the President Judge of the County and the woman there involved was a courthouse employee working in the Adult Probation Office. Her job required her to be in Respondent's courtroom whenever he was hearing criminal cases. There the testimony was that Respondent repeatedly called her into his robing room and spoke to her about personal matters and about their getting together on weekends. Respondent unremittingly called her on the telephone asking her to spend the weekend with him. Respondent persisted in this conduct for eight months until the woman quit her job. We held that "the conduct at issue is unre-

2. Actually the videotape runs to 6:43 p.m., but after 5:55 F got busy with a customer and then made a twenty minute phone call to a friend and fellow employee and nothing of any import occurred after 5:55.

lated to Respondent's adjudicative responsibilities" and concluded that "the conduct does not constitute a violation of ... subsection (3) ... of Canon 3A." (*Cicchetti, supra,* at 313–14).[3]

So it is in this case: the conduct is the same; the charge is the same; and our decision is the same.[4]

Four other cases are cited by the parties (all involving magisterial district judges) where violations of Rule 4C. were charged. These cases are entirely consonant with our holding here.

In two of the cases, *In re Zoller*, 792 A.2d 34 (Pa.Ct.Jud.Disc.2001) and *In re Marraccini*, 908 A.2d 377 (Pa.Ct.Jud.Disc. 2006), the charges were based on a one-time occurrence (as here); but, in those cases, the discourteous conduct took place during actual judicial proceedings.[5]

In the other two cases, *In re Berkhimer*, 877 A.2d 579 (Pa.Ct.Jud.Disc.2005) and *In re Brown*, 907 A.2d 684 (Pa.Ct.Jud.Disc. 2006), the charges were based on conduct which occurred in those Respondents' judicial offices every day, all day long, for years. For example, in *Berkhimer* we found that:

> Respondent routinely, regularly, frequently, often, used crude, coarse, vulgar, offensive and improper language, including frequent use of the F-word, in conversing with his female staff and others in the course of an ordinary day at the office. (Finding of Fact No. 25).

*In re Berkhimer, supra,* at 584. In *Brown* it was much of the same except that Judge Brown's remarks were directed at demeaning the women who worked for him and included racial epithets that were an everyday fact of life in that office over a period of twenty-eight years (1977 to 2005). In both cases the offending conduct was so routine, so pervasive, so long-lasting that its occurrence in the course of adjudicative activity was inescapable.

As stated above, the one-time occurrence which gave rise to this case did not occur during and was in no way related to any adjudicative activity of this Respondent. It is so stipulated: See Stipulation/Finding of Fact No. 20, *supra*, p. 4.

> During the events described below, Respondent was not adjudicating cases. None of the events recounted below involved hearings or trials or members of his court staff. Respondent was not wearing his judicial robe, was not dealing with parties or counsel, and was not interacting with members of the public.

We find that the Board has not established a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges by clear and convincing evidence.

*Count 3.* Violation of Article V, Section 17(b) of the Pennsylvania Constitution.

Section 17(b) of the Pennsylvania Constitution provides:

> Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial

---

**3.** Canon 3A. of the Code of Judicial Conduct is the counterpart of Rule 4 of the Rules Governing Standards of Conduct of Magisterial District Judges, and subsection (3) of Canon 3A. is identical to section (C) of Rule 4.

**4.** The Board appealed our decision in *Cicchetti* to the Supreme Court alleging various errors. The Supreme Court affirmed but did not review our holding on Canon 3A, as the Board did not appeal from that holding.

**5.** In *Zoller* the conduct took place on the bench and in *Marraccini* the Respondent walked out of the courtroom and into the waiting room to deliver his verdicts to the defendants who were there attending.

ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.

■ Although the drafters might have expressed their intention more straightforwardly in respect of its application to justices of the peace,[6] this section has been interpreted to mean that if a justice of the peace violates a rule prescribed by the Supreme Court, as, for example, Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges, it will also constitute a violation of Section 17(b) (*In re Joyce and Terrick,* ·712 A.2d 834, 845 (Pa.Ct.Jud.Disc.1998)). We have held that the violation of Section 17(b) in such a case is "automatic [and] derivative." *Id.* at 846. However, since there was no violation of Rule 4C. in this case, there is no violation of Section 17(b).

*Count 2.* Violation of Article V, Section 18(d)(1) of the Pennsylvania Constitution for Conduct Which Brings the Judicial Office into Disrepute.

■ Frequently this Court has been called upon to decide whether particular conduct was such that brought the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution. In *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997), *aff'd,* 560 Pa. 183, 743 A.2d 431, 443–44 (2000), we laid out the factors and the process for making these decisions. In that case, referring to our earlier case of *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996), we said:

> We also had the occasion in *In re Smith, supra,* at p. 1238–39, to determine whether a judge's delay in disposing of cases had brought the judicial office into disrepute. In the course of that opinion we reasoned:

> (1) it cannot be *presumed* that a violation of any other provision, constitutional, canonical or criminal *automatically* lowers public acceptance of the authority of the judicial office (emphasis added). *Id.* at p. 1238; and

> (2) "Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct. Even if a judicial officer's conduct could reasonably result in the lessening of respect for that judge, it cannot be *assumed* that the same actions would necessarily bring the judicial office into disrepute. *Id.* at 1239. (Emphasis the Court's).

■ In deciding these "disrepute" cases we have frequently considered the "reasonable expectations of the public" as these expectations related to various conduct of various judicial officers. *See, e.g., In re Cioppa,* 51 A.3d 923 (Pa.Ct.Jud.Disc. 2012); *In re Merlo,* 34 A.3d 932 (Pa.Ct. Jud.Disc.2011); *In re Murphy,* 10 A.3d 932 (Pa.Ct.Jud.Disc.2010); *In re Alonge,* 3 A.3d 771 (Pa.Ct.Jud.Disc.2010); *In re Berry,* 979 A.2d 991 (Pa.Ct.Jud.Disc.2009); *In re Singletary,* 967 A.2d 1094 (Pa.Ct.Jud. Disc.2008); *In re Lokuta,* 964 A.2d 988 (Pa.Ct.Jud.Disc.2008); *In re Hamilton,* 932 A.2d 1030 (Pa.Ct.Jud.Disc.2007); *In re Marraccini,* 908 A.2d 377 (Pa.Ct.Jud.Disc. 2006); *In re Zupsic,* 893 A.2d 875 (Pa.Ct. Jud.Disc.2005); *In re Berkhimer,* 877 A.2d 579 (Pa.Ct.Jud.Disc.2005); *In re Harrington,* 877 A.2d 570 (Pa.Ct.Jud.Disc.2005); *In re McCarthy,* 828 A.2d 25 (Pa.Ct.Jud. Disc.2003); *In re Zoller,* 792 A.2d 34 (Pa. Ct.Jud.Disc.2001); *In re Kelly,* 757 A.2d 456 (Pa.Ct.Jud.Disc.2000); *In re Strock,* 727 A.2d 653 (Pa.Ct.Jud.Disc.1998); *In re Joyce and Terrick,* 712 A.2d 834 (Pa.Ct. Jud.Disc.1998); and *In re Trkula,* 699 A.2d

---

**6.** Now magisterial district judges.

3 (Pa.Ct.Jud.Disc.1997). We think that the public—even those members of the public who register the lowest scores on the sensitivity index—do not expect their judges to be conducting photo sessions featuring the judicial penis and then to be sending the photos over the electronic airwaves to another person—thereby placing that person in a position to further publish the photos to anyone he or she may deem deserving.

■ Characterization of these actions may challenge the adjectival repertoire; but they were surely intentional. That is self-evident and we will not belabor the point. Respondent does not contend otherwise. But Respondent does contend that his showing them to F was unintentional—an accident; they just slipped, unexpectedly, out of the phone. We find otherwise.[7]

First, we do not believe Respondent. We agree with the Board's suggestion that taking photographs of one's erect penis is a "memorable event." We also mention that they weren't stored in Respondent's phone for nothing—they were stored in his phone for re-viewing. What else? We find that Respondent knew the photographs of his penis were in his phone and that he showed them to F intentionally.

■ Second, even if we were to assume that Respondent did not remember that those photos were in his phone that night, we will not permit Respondent's capricious memory to trespass upon our analysis of whether there is the element of *mens rea* here sufficient to require a finding that Respondent's conduct was such that brings the judicial office into disrepute. We will not permit a claimed capricious memory to

rescue Respondent from responsibility for the distressful culmination of a chain of events which he intentionally set in motion. We hold that a judge who intentionally grooms his penis for photography, and then intentionally photographs his penis for the purpose of display to others, had better remember that the photographs are in his phone lest they "slip out" at some inopportune (albeit unplanned) time under circumstances which are likely to offend another person or persons, for, if they do, we will hold such conduct satisfies the "*mens rea* requirement" so as to support a finding that the conduct is such that brings the judicial office into disrepute.

■ We also find that Respondent's conduct was so extreme as to bring the judicial office into disrepute. *See, e.g., In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc. 1997).

## IV. *CONCLUSIONS OF LAW*

1. The Board has failed to establish by clear and convincing evidence that Respondent's conduct constitutes a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges or a violation of Article V, Section 17(b) of the Pennsylvania Constitution.

2. The Board has established by clear and convincing evidence that Respondent's conduct is such that brings the judicial office into disrepute in violation of Article V, Section 18(d)(1) of the Pennsylvania Constitution,

3. Respondent is subject to discipline under Article V, Section 18(d)(1) of the Pennsylvania Constitution.

---

**7.** This is important because a finding that conduct is such that brings the judicial office into disrepute must be supported by the element of *mens rea;* such a finding will not be

made where the conduct was purely accidental. *See, In re Whittaker,* 948 A.2d 279 (Pa.Ct. Jud.Disc.2008); and *In re Crahalla,* 747 A.2d 980 (Pa.Ct.Jud.Disc.2000).

Judge JAMES, Judge MORRIS and Judge MULLEN did not participate in the consideration or disposition of this case.

### ORDER

AND NOW, this 13th day of December, 2012, after hearing on the issue of sanctions, it is hereby ORDERED that Respondent, Willie F. Singletary, is hereby removed from office as traffic court judge of Philadelphia County.

PER CURIAM.